P /30
530

## PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name  CLEVELAND          PAUL              K.
    (Last)              (First)            (Initial)

Prison Number  C99765

Institutional Address P.O. Box 689 – ZW345, Soledad, CA 93960-0689

JAN 2 5 2008

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| PAUL CLEVELAND<br>(Enter the full name of plaintiff in this action.) | ) ) ) | Superior Ct. No.      BH004260<br>Cal. Ct. App. No.     B 202236<br>Cal. Supreme Ct. No.  S156864 |
| vs.<br>Case No. | ) ) ) | Case No. _____<br>(To be provided by the Clerk of the Court) **MMC** |
| B. CURRY, Warden (A) | ) ) | **PETITION FOR A WRIT** |
| _____ | ) ) | **OF HABEAS CORPUS AND** |
| _____ | ) ) | **REQUEST FOR EVIDENTIARY**<br>**HEARING**   **(PR)** |
| (Enter the full name of respondent(s) or jailor in this action) | ) | |

## Read Comments Carefully Before Filling In

### When and Where to File

You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as the loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your petition will likely be transferred to the district court for the district that includes the institution in which you are confined. Habeas L.R. 2254-3(b).

1  Who to Name as Respondent

2      You must name the person in whose actual custody you are. This usually means the Warden or

3  jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

5      If you are not presently in custody pursuant to the state judgement against which you seek relief

6  but may be subject to such custody in the future (e.g. detainers), you must name the person in whose

7  custody you are now <u>and</u> the Attorney General of the state in which the judgement you seek to attack

8  was entered.

9  A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

10     1. What sentence are you challenging in this petition

11         (a)   Name and location of court that imposed sentence (for example, Alameda

12             County Superior Court, Oakland):

13

14          Superior Court                   Los AngelesCounty

15            (Court)                     (Location)

16         (b) Case number, if known   A00007

17         (c) Date and terms of sentence   01/85, 25 years to life.

18         (d) Are you now in custody serving this time? (Custody meaning being in jail,

19         on parole or probation, etc.)         Yes XXX    No _____

20         Where?

21         Name of institution:   Correctional Training Facility

22         Address:   P.O. Box 686, Soledad, CA 93960-0686

23      2. For what crime were you given this sentence? (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known. If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  Penal Code § 187, First-degree Murder.

27

28

PET. FOR WRIT OF HAB. CORPUS    - 2 -

1       3. Did you have any of the following?

2           Arraignment:                                Yes _XXX_      No _____

3           Preliminary Hearing:                  Yes _XXX_      No _____

4           Motion to Suppress:                 Yes _XXX_      No _____

5       4. How did you plead?

6           Guilty _XXX_    Not Guilty _____    Nolo Contendere _____

7           Any other plea (specify) _____

8       5. If you went to trial, what kind of trial did you have?

9           Jury _____    Judge alone _____    Judge alone on transcript _____

10      6. Did you testify at your trial?               Yes _____    No _____

11      7. Did you have an attorney at the following proceedings:

12          (a)    Arraignment                 Yes _XXX_      No _____

13          (b)    Preliminary hearing         Yes _XXX_      No _____

14          (c)    Time of plea                Yes _XXX_      No _____

15          (d)    Trial                      Yes _____    No _____

16          (e)    Sentencing                Yes _XXX_      No _____

17          (f)    Appeal                   Yes _____    No _____

18          (g)    Other post-conviction proceeding    Yes _____    No _____

19      8. Did you appeal your conviction?          Yes _____    No _____

20          (a)    If you did, to what court(s) did you appeal?

21                   Court of Appeal            Yes _____    No _XXX_

22                   Year: _____        Result: _____

23                   Supreme Court of California      Yes _____    No _____

24                   Any other court            Yes _____    No _____

25

26          (b)    If you appealed, were the grounds the same as those you are raising in this

27

28

| | | | |
|---|---|---|---|
1 | | Petition? | Yes _____ No _____
2 | | Was there an opinion? | Yes _____ No _____
3 | (c) | Did you seek permission to file a late appeal under Rule 31(a)? |
4 | | | Yes _____ No _____
5 | | If you did, give the name of the court and the result: |

6

7

8        9. Other than appeals, have you previously filed any petitions, application or motions with

9    respect to this conviction in any court, state of federal?        Yes _XXX_        No _____

10        [Note; if you previously filed a petition for a writ of habeas corpus in federal court that

11    challenged the same conviction you are challenging now and if that petition was denied or dismissed

12    with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13    for an order authorizing the district court to consider this petition.  You may not file a second or

14    subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28

15    U.S.C. §§ 2244(b).]

16        (a)    If you sought relief in any proceeding other than an appeal, answer the following

17            questions for each proceeding.  Attach extra paper if you need more space.

18            I.    Name of Court: _Superior Court, Los Angeles County_

19                Type of Proceeding: _Habeas Corpus_

20                Grounds raised (Be brief but specific):

21                a._Same as enclosed_

22                b._____

23                c._____

24                d._____

25                Result: _Denied_        Date of Result: _05/01/07_

26            II.    Name of Court: _Calif. Court of Appeals_

27                Type of Proceeding: _Habeas Corpus_

28                Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS                - 4 -

1          a. Same as enclosed _____

2          b._____

3          c._____

4          d._____

5          Result: Denied _____ Date of Result: 09/25/07 _____

6    III.    Name of Court: Calif. Supreme Court _____

7            Type of Proceeding: Petition For Review _____

8            Grounds raised (Be brief but specific):

9            a._____

10           b._____

11           c._____

12           d._____

13           Result: Denied _____ Date of Result: 10/28/07 _____

14   IV.     Name of Court: _____

15           Type of Proceeding: _____

16           Grounds raised (Be brief but specific):

17           a._____

18           b._____

19           c._____

20           d._____

21           Result: _____ Date of Result: _____

22   (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                                               Yes _____   No XXX

24          Name and location of court: _____

25   B. GROUNDS FOR RELIEF

26   State briefly every reason that you believe you are being confined unlawfully. Give facts to

27   support each claim. For example, what right or privilege were you denied? What happened? Who

28   made the error? Avoid legal arguments with numerous case citations. Attached extra paper if you

1   need more space. Answer the same questions for each claim.

2       [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3   petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); **McCleaskey v. Zant**,

4   499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5       Claim One: See Attached _____

6       _____

7       Supporting Facts: _____

8       _____

9       _____

10      _____

11      Claim Two: See Attached _____

12      _____

13      Supporting Facts: _____

14      _____

15      _____

16      _____

17      Claim Three: See Attached _____

18      _____

19      Supporting Facts: _____

20      _____

21      _____

22      _____

23      If any of these grounds were not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25      N/A _____

26      _____

27      _____

28      _____

1    List, by name and citation only, any cases that you think are close factually to yours so that

2 they are an example of the error you believe occurred in your case. Do not discuss the holding or

3 reasoning of these cases:

4    See Attached

5

6

7 Do you have an attorney for this petition?                         Yes _____      No_XXX_

8 If you do, give the name and address of your attorney:

9    In Pro Persona

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled

11 in this proceeding. I verify under the penalty of perjury that the foregoing is true and correct.

12

13 Executed on _January 17, 2008_

14         Date                              Signature of Petitioner

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Paul Cleveland C99765
P.O. Box 689 - Z345L
Soledad, CA 93960-0689

In pro per

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

Paul Cleveland          )
    Petitioner      )
               )
    v.              )
               )
Ben Curry, Warden       )
    Respondent      )
_____)

Case No. _____

Superior Court # BH004260
Appeals Court # B 202236
Supreme Court # S156864

**PETITION FOR WRIT OF HABEAS CORPUS AND REQUEST FOR EVIDENTIARY HEARING**

Paul Cleveland C99765
P.O. Box 689 - Z345L
Soledad, CA 93960-0689

In pro per

1   Paul Cleveland C99765
    P.O. Box 689 - Z345L
2   Soledad, CA 93960-0689

3   In pro per

4       .

5

6

7

8                   UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11

12

13  Paul Cleveland          )              Case No. _____
        Petitioner          )
14                          )              Superior Court # BH004260
        v.                  )              Appeals Court # B 202236
15                          )              Supreme Court # S156864
    Ben Curry, Warden       )
16      Respondent          )              **PETITION FOR WRIT OF HABEAS
    _____)              CORPUS AND REQUEST FOR
17                                         EVIDENTIARY HEARING**

18

19

20      Comes now, Petitioner, Paul Cleveland, in the above entitled matter and moves this Court

21  for petition of writ of habeas corpus and request an evidentiary hearing,  In support of the petition,

22  Petitioner declares that he has been denied due process of law by the Board of Parole Hearings in

23  their denial of parole on evidence possessing no indicia of reliability, resulting in an unreasonable

24  determination of the facts in light of the evidence and a failure to abide by the terms of Petitioner's

25  negotiated and stipulated plea agreement. This denial resulted in a denial of Petitioner's

26  constitutionally protected liberty interest in he expectation of a parole release date created not only

27  by controlling statutory law, but by Petitioner's plea agreement.

28      The basis for the contentions are as follows:

                                              1

**GROUNDS FOR RELIEF**

Ground One

Petitioner is being arbitrarily and capriciously denied his constitutionally protected liberty interest in parole and his fifth and fourteenth amendment rights to due process and equal protection under the law by the Board's denial of parole for the third time, on factors relating to the commitment offense.  (McQuillion v. Duncan; Biggs v. Terhune.)

Ground Two

Petitioner was denied due process of law under Peal Code § 3041 by the Board's failure to base its denial of parole on relevant evidence and evidence possessing an indicia of reliability relating to Petitioner current risk of danger to society.  (Biggs v. Terhune; Superintendent v. Hill; In re George Scott.)

Ground Three

Petitioner was denied due process and equal protection under the law by the Board's clear and unmistaken predetermined denial of parole.  Such actions constitute an arbitrary and capricious denial.

Ground Four

Petitioner was denied due process by the reliance on unchanging factors of the commitment offense, when such factors do not relate to the standards of callousness or egregiousness outlined in controlling precedent; rendering the denial as arbitrary and capricious.  (Irons v. Warden; Blair v. Folsom State Prison; In re Smith; In re George Scott.)

Ground Five

Petitioner was denied his constitutionally protected right to liberty and due process by the states failure to respect the terms of his negotiated plea bargain where such terms, merged with the plea bargain, were settled according to 'Contract Principles.'

2

# INTRODUCTION/FACTS

## I

Comes now, Petitioner, Paul Cleveland, in the above entitle matter, and petitions this Court for Writ of Habeas Corpus requesting the ordering of "SPECIFIC PERFORMANCE" of his negotiated and stipulated plea agreement and there from, his release from prison, or alternatively, an order directing a new parole consideration hearing consistent with this court's order directing a parole released date be set. In support of this verified petition, Petitioner does state as follows:

## II

This case arises out of the third denial of parole to Petitioner following his 1985 plea bargain for violation of Penal Code § 187.

## III

Following his 1985 (pled and stipulated) agreement, Petitioner has spent the past 22 years proving himself worthy of parole in every respect possible.

## IV

Petitioner does not, here, challenge the underlying conviction. Rather, the Board's repeated denials of parole in violation of controlling statutory law, and legal precedent on the various subject matters herein presented and the plea bargain.

## V

Even had the contractual obligation inherent in a plea bargain not been controlling on the state and Board of Parole Hearings (BPH or Board), Petitioner's on going confinement is still reviewable by this Court in that after 3 parole suitability hearings the Board is still denying Petitioner parole based solely on factors relative to the "egregiousness and callousness" of the crime (see Biggs v. Terhune, (9th Cir. 2003) 334 F.3d 910, and McQuillion v. Duncan, (9th Cir. 2002) 306 F.3d 895, 901). The Board and other agents of the state, such as the District Attorney's office, are collaterally estopped from raising such issues at a parole suitability hearing where by virtue of the existence of the plea bargain they have previously stipulated to the minimal degree of the crime, and waived the right to later assert any advanced degree of culpability.

## VI

3

1  Had this case arose out of a finding of guilty by a jury, the Board would still be barred from
2  using the factors of the commitment offense to deny parole for the third time. The unchanging
3  factors of a commitment offense are not reliably used past the initial parole suitability hearing and to
4  so use such factors raise Petitioner's claims to violations of due process. Such repeated denials show
5  an utter failure of the parole system and a clear infringement upon Petitioner's due process
6  rights. (Biggs v. Terhune, (9th Cir. 2003) 334 F.3d 910).

## VII

8  Petitioner's belief based upon the assurances of not only his counsel, but the District
9  Attorney, were such that he believed that not only would he receive, at a minimum, without the plea
10 Life Without the Possibility of Parole, or worse the Death Penalty, but with the plea bargain, he was
11 informed (once the two years were served for the gun use enhancement) he was to be paroled at his
12 minimum eligible parole release date of 16 years, 8 months. This parole was dependant on the
13 condition that Petitioner would commit no felonious acts during his period of incarceration. He was
14 informed that all Special Circumstances allegation were to be dismissed in the interest of justice.
15 Under the plea agreement, Petitioner reasonably believed he would therefore serve no more than 18
16 years, 8 months. Petitioner has now served 22+ years of continuous custody. Petitioner reasonably
17 believes this is a violation (in itself) of his plea bargain and his plea negotiations.

## VIII

19 Had Petitioner been aware at the time of his agreeing to the terms of his negotiated plea
20 bargain, that he would not be released at the agreed upon time or worse that the state would
21 intentionally violate the terms of his plea by refusing to allow him release, he would not have
22 accepted and signed his plea bargain agreement.

## IX

24 During Petitioner's parole suitability hearing, the Commissioners made very telling
25 statements regarding their belief in Petitioner's unsuitability, which seem to demonstrate the
26 predetermined nature of the denial. For example:

27 Deputy Commissioner Mejia:

28  (Exhibit D, p. 37, l. 14-16): "Why did it take you a long time to report for
   A.A. or N.A. or do something for substance abuse?"

4

(Exhibit D, p. 37, l. 23-37 and page 38, line 1): "Well I been looking at your psych reports, there was some discrepancies here where in told that you were using... why did you tell them you were using heroin? At the day of the time of your commitment, you were using heroin also."

Inmate Cleveland (Petitioner):

"I told – that was taken from the Probation Report. At the time I was facing the Special Circumstances and Death Penalty, and the guys in the jail told me that if I attempted to use a diminished capacity defense that I probably wouldn't be executed for the crime. So I went with that."

Deputy Commissioner Mejia:

(Exhibit D, p. 44): "You have suffered fifteen 115's, the last being from the period of 1985, since your inception, and 1999 being the last.

(Exhibit D, p. 43): "The last one in (indiscernible) and one in 2000. You have nine 128's from 1986 to 2001..."

(Exhibit D, p.43, l. 27): "I mean, do you realize, maybe you didn't realize it then, I mean, if the Board is unforgiving about one thing, it is 115's."

(Exhibit D, p. 44, l. 6): "And I don't think I should – and I read you wanted to be – it's like the heroin thing, you know, it's ..."

(Exhibit D, p. 44, l. 11): "Don't try to outsmart the system. Don't try to make to your benefit because your just..."

(Exhibit D, p. 44, l. 16): "Well, saying that you were addicted to heroin so that you could get a easier – I don't know, what was that?"

Attorney Spowart (Representing Petitioner):

"So he wouldn't get the death penalty."

Commissioner St. Julien:

"Yeah, yeah."

"Well, I was going to say the same thing is that I was going to make an assessment that he's very manipulative, at least from what I saw on those two occasions there. The 115's and the (indiscernible) Death Penalty. So I don't know what to believe and what is..."

## X

Clearly, since this Board had this information prior to the hearing and it not only reviewed the information, but also reached a conclusion contrary to the stated and statutory goal of assessing Petitioner present dangerousness. Even if it is true that Petitioner, 22 years ago, knowingly manipulated the system to save his life, he cannot undo nor change those circumstances. Certainly,

5

1    Petitioner has a right to a hearing from unbiased commissioners where in a finding regarding

2    suitability is determined on present/current evidence, tending to reasonably relate to Petitioner's

3    current dangerousness. The state of the current evidence is convincing that Petitioner is not a current

4    danger to the public. None of his CDC 115's or 128's are recent – nor violent – nor the result of

5    heroin (or any other drug) use. The psychological evaluations for the past 7 years are supportive of

6    release and reflect an inmate ready to regain his place in society.

## XI

8    It is clear from the transcripts that the panel had a clear and predetermined state of mind

9    against parole, and this Petitioner.

> (Exhibit D, pp.68-69.) "Yours is a hard case. You've got a fist degree murder and you've got somebody you had no business being there. There is no way to predict that you would ever put yourself in that situation, but almost (indiscernible) is what you've done since then. You know getting 115's (indiscernible) your own understanding, getting the 115's to reduce your custody level, you know, I know why you did it... but you can't do stuff like that. And you can't maintain for years that you've had a heron addiction. I mean, if your going to make up a story like that, continue it all the way through. You don't go to A.A. or N.A. or whatever. But, you know, here we're now faced with, well, what's this guy up to? You know, is he truly a manipulator and will this man continue – what's he going to do when he's outside? And just for your whatever, I did your matrix. I worked out your term, and unfortunately, you're not close."

> (Exhibit D, p. 69, l. 10-12): "Right now, your looking at, you know, you've got – at least 8 years away."

## XI

19    Clearly and unlawfully, this panel never had any intention of setting a term or giving Petitioner a

20    parole date. Worse yet, they clearly knew this ahead of time, rendering this hearing nothing more

21    than a "pro forma" preceding in violation of the due process clause of the United State Constitution.

## XII

23    Furthermore, as to the continued use of the commitment offense factors to deny parole – the

24    Board found Petitioner was unsuitable for parole based on such factors as; (a) the offense was

25    carried out in a cruel manner, (b) motive was trivial in relationship to the offense, (c) there is a

26    juvenile probation for siphoning gas, (d) programmed in a limited fashion; and would pose an

27    unreasonable risk of danger to society if released.

28    In a very contradictory nature, the panel also found and/or more than implied that the

1  victim's death was not intentional and was specifically brought about by the victim attacking

2  Petitioner with a 2x4 – albeit while his store was being robbed; the victim was shot only once and

3  suffered to a minimal degree as the shot was to the head. (See Exhibit D, at pp. 67-68.)

4      The panel found the psychological report to be favorable and that Petitioner's parole plans

5  are realistic and good, his residential plans are viable as is his employment plans.

6      The totality of the evidence concedingly is "some" evidence, tending however, to show

7  suitability, rather than unsuitability under Cal. Regs. tit., 15 § 2402 (B)(D). None of the factors in

8  unsuitability apply and indeed all under suitability conclusively apply.

9  **LEGAL BACKGROUND**

10      The Board derives its authority to make suitability determinations from the California State

11  Legislature under Penal Code § 3041. Such statutes establish that the Board "shall normally set a

12  parole release date", and must normally do so at the initial hearing. This mandate "creates a

13  presumption that the inmate will have a date set at the initial hearing. McQuillion v. Duncan, (2003)

14  306 F.3d 895, 901) [the scheme "creates a presumption that parole release will be granted"]. Thus,

15  the Board's authority is limited in that it must usually grant parole, must do so at the initial hearing,

16  and only has authority to deny parole in [particularly] egregious cases, the gravest of offenses.

17      Since the Board's authority is derived from statute (§ 3041) it is required to follow statutory

18  guidelines regarding parole.

19      Due to the inherent conflict between the law and the Board's action(s), the method by which

20  the Board conducts hearings has come under increasingly intense scrutiny by the California Judicial

21  and Legislative branches. Numerous courts have recently found that the Board has (and does)

22  violate the due process rights of prisoners by infringing upon their liberty interest in parole created

23  by Penal Code § 3041.

24      Clearly, as a consequence of the acceptance of the stipulated plea bargain of 27 years to Life,

25  the Court, at sentencing, agreed to a term of 25 to life (which carries a minimum eligible parole date

26  of 16 years, 8 months) with a 2 year enhancement for gun use. That "agreement" and "acceptance"

27  places Petitioner at the low end of the matrices of 16 years, 8 months, regardless of the regulatory

28  minimum of 25 years under the matrices. It also mandates that the Board is constrained from

7

1  considering any factors above that "minimally necessary" to sentence Petitioner to the offense for
2  which he pled.

3  **STATE COURT STANDARD OF REVIEW**

4      The standard of review mandatory applied in state courts under the California due process

5  clause and statutory provisions, set forth standards and criteria that limits the Parole Board decision

6  and give rise to a protected liberty interest [see In re Rosenkrantz (2002) 29 Cal.4th 616, 657]. It is

7  true however, that this same decision took away much of the courts' ordinary power in reviewing

8  parole decisions. None the less, the Supreme Court stated:

9          "[w]e conclude that the judicial branch is authorized to review the factual
           basis of a decision of the Board denying parole in order to ensure that the
10         decision comports with the requirements of due process of law."

11     Expanding on this, the court in In re Dannenberg (2005) 34 Cal.4th 1061 acknowledged that

12  the overriding concern in the guiding statutory and regulatory sections was the responsibility to

13  ensure public safety. In Dannenberg the court cited Penal Code § 3041(a) and reiterated that:

14         "In stating the Board "shall normally" set a parole date when a prisoner
           approaches his minimum parole eligibility release date did not mean
15         generally or in most cases. Instead the Board can and should first
           consider under section 3041(b) whether a prisoner's commitment crime
16         and/or other past crimes require further delay in setting a release date
           because of public safety concerns."
17

18     The High Court suggested the "some evidence" standard must tend to prove the existence of

19  some factor which is relevant to the ultimate finding the statute requires before parole can be denied

20  – release of the prisoner on parole would create an unreasonable risk to public safety. In a similar

21  view the Rosenkrantz, supra, court held:

22         "The governing statute provides that the Board must grant parole unless it
           determines that public safety requires a lengthier period of incarceration
23         for the individual because of the gravity of the offense underlying the
           conviction."
24

25     In clarifying this rational, the Dannenberg court emphasized that the gravity of the current or

26  past convicted offense or offenses must demonstrate that the prisoner remains [at present time] a

27  danger to public safety. (See Dannenberg 34 Cal.4th at p. 1098.)

28     One court explained:

8

1
2

"Returning to the statutory test, only evidence bearing on the likelihood of recidivism and only to the extent it reveals an "unreasonable risk" of same is relevant to the decision whether to grant or deny parole."

3      Similarly, the Court of Appeals in the 2005 decision of In re Luna 126 Cal.App.4th 585, 591,

4    pointed out that:

5
6
7

"A parole release decision authorizes the Board (and Governor) only to identify and weigh the factors relevant to predicting...whether the inmate will be ale to live in society without committing additional antisocial acts."

8      The same court (Id.) concluded that the factors relevant to that decision are not spelled out in

9    statutes enacted by the legislator, but in regulations promulgated by corrections administrators. (See

10    Cal. Code Regs., tit. 15, § 2402(c)(1) and Cal. Code Regs., tit. 15, § 3402(c)(2) – (6) and (D).

11      As stated in In re Lee (2006) 143 Cal.App.4th 1400, 1408:

12
13

"The test is not whether some evidence supports the reason the Governor cites for denying parole, but whether some evidence a parolee's release unreasonably endangers public safety."

14      In the case at bench, there is not one scintilla of evidence in the record which rationally

15    relates to (when attached to the commitment offense) the appropriate and controlling standards or the

16    due process clause of the California Constitution, which demonstrates that Petitioner will either be a

17    danger to public safety (see Rosenkrantz, supra; Dannenberg, supra) or that can reasonably identify

18    and/or help weigh factors relevant to predicting whether Petitioner will be able to live in society

19    without committing antisocial acts bearing on the likelihood of recidivism to the extent it reveals an

20    "unreasonable risk" of same. (See Delune, supra; In re Dannenberg II 2007 DJDAR 17131

21                                **STATEMENT OF THE CASE**

22                                                    **I**

23      Petitioner is currently confined at the Correctional Training Facility at Soledad, in custody of

24    the Director of Corrections and specifically Ben Curry, Warden (A), pursuant to a plea bargain

25    agreement, and a sentence thereto on January 8, 1985. There existed no Special Circumstances that

26    survived the merging of the complaint with the plea bargain.

27                                                    **II**

28      Petitioner complaints that his date/term has not been set/fixed in the manner prescribed by

9

law (Penal Code § 3041(a) (b); Cal. Code Regs. tit., 15 §§ 2400-2403(c); McQuillion, supra, 306 F.3d 895; Penal Code § 1192.1; and the terms of plea agreement.)

**III**

The crime occurred on May 23, 1983, and Petitioner has been in continuous custody since the time he was arrested. Petitioner was sentenced on January 8, 1985 by way of a stipulated and negotiated plea bargain. Petitioner's actual "prison" time began to run on January 27, 1985 and thereby renders Petitioner's actual prison time to 21+ years served. Coupled with the pre-sentence credits applied by the Court, of 909 days, and those credits mandated by regulation (Cal. Code Regs. tit., 15 2410) of 4 months per years of positive programming and prison time. Time served by Petitioner is now 27 years, 6 months. The maximum term Petitioner could serve under the matrices – without a stipulated plea bargain and considerations – is 33 years (given a situation involving the most egregious and heinous circumstances envisioned in designing the matrix system). However, categorically, Petitioner's maximum time, (absent a plea bargain) is found under category I – A involving a range of 25-26-27 years. Clearly, Petitioner as exceeded every possible matrix range fir the crime to which he plead.

**IV**

Petitioner has appeared before the Board on 3 occasions since his minimum eligible parole date of April 4, 2001 (inclusive) and has been denied parole on each and every occasion based on, primarily, the unchanging factors of the commitment offense.

**V**

Petitioner filed his original petitioner for writ of habeas corpus in the Superior Court for the County of Los Angeles on September 5, 2006, which was denied on May 1, 2007. Petitioner was notified of this denial on July 2, 2007. (Exhibit A.) Petitioner filed his writ of habeas corpus in the Court of Appeals, Second District, on September 20, 2007 and was denied September 25, 2007. (Exhibit B.)

**VI**

Petitioner filed his petitioner for review in the California Supreme Court on October 1, 2007, which was denied on November 28, 2007. (Exhibit C.)

10

Petitioner now files his instant petition on January ___/ 7___, 2008.

## STATEMENT OF FACTS

## IN RE SUITABILITY

## MARKETABLE SKILLS

Petitioner has gainful employment opportunities available upon a finding of suitability and release.

For instance, Petitioner has a verifiable job offer with "Small Stage Productions," which provides schools, churches, community organizations, etc. with published theatrical works, set designs, costumes patterns and related items via the internet. Petitioner would be employed as a Network Manager. The proposed employer would provide finical assistance for any additional related educational training he may require, but not yet poses.

Petitioner would earn a starting salary of $32,000 a year. Should Petitioner "be permitted" to relocate to Vancouver, Washington (Small Stage Productions base of operations), Petitioner would be provided room and board and a car at his disposal .

**Furthermore**

Petitioner has completed the "Information and Technology Computer Programming" course and is certified by Creekside Adult School of California, certification log number "MM00004C-99765." The Evaluation of Employability documents Petitioner as employable as Computer Programmer, Program Analyst, Technical Support Specialist, Network Control Operator.

The Board recognizes employment in Prison Industries Authorities (PIA) as equivalent to vocational training, providing the assignment has longevity and the prisoner receives positive work reports. Petitioner has been assignment in a variety of PIA jobs, including the upholstery shop from 1988-1993, receiving average to exceptional grades in his work reports. (Exhibit G.)

Petitioner has completed and is certified in "Total Quality Management" by the California Prison Industry Authority and is qualified to instruct others in quality management practices, with a focus on upholstery products manufacturing.

## SELF-HELP AND THERAPY

Petitioner has completed Houses of Healing – Anger Management/Self Awareness course in

11

1 | 2001, from Mule Creek State Prison.

2 |     Petitioner completed and is certified in a Lifer Group sponsored and conducted by Dr. M.J.

3 | Morris, Ph.D., Staff Psychologist, on May 5, 1995. This group had an emphasis on (a) Stress

4 | Management, (B) Anger Control, and (C) Relaxation Techniques. This is a 20 week course.

5 |     Petitioner is an ongoing and active participant in N.A. and A.A. and has been from 2000 to

6 | present. In addition to Narcotics Anonymous and Alcoholics Anonymous groups, Petitioner

7 | participated in, simultaneously, an N.A sponsored "One Day At A Time" group, which he attended

8 | 35 out of 35 meetings, from July 2000 – March 2001.

9 |     Petitioner voluntarily participated in an "Emotional Literacy" course sponsored by Houses of

10 | Healing, which is component of the "Stop" program, focusing on staying out of prison.

11 |     Petitioner has recently completely an internationally renowned Anger Management course

12 | sponsored by the Quakers and presented Associate Warden W. Hill, entitled "Alternative to

13 | Violence Project," on June 8, 2006.

14 | **EDUCATIONAL ACHIEVEMENTS**

15 |     Petitioner has a G.E.D. issued by the Superintendent of Public Instruction for the State of

16 | Washington.

17 |     Petitioner voluntarily completed several courses in correspondence with the United States

18 | Fire Administration and F.E.M.A. Such as (a) A Citizens Guide to Disaster Assistance, (b)

19 | Department of Homeland Security IS-195 and Basic Incident Command System, (c) Mitigation for

20 | Homeowners, (d) Introduction to Mitigation, (e) Emergency Preparedness, USA, (f) State Disaster

21 | Management, (g) Animals in Disaster, Community Planning, (h) Animals in Disaster, Awareness

22 | and Preparedness, (i) Radiological Emergency Management, (j) Radiological Emergency Response,

23 | (k) Emergency Planning, (l) Developing and Managing Volunteers, (m) Retrofitting Flood Prone

24 | Residential Structures, (n) Hazardous Materials – a Citizen's Orientation, (o) Building for the

25 | Earthquakes of Tomorrow, (p) Livestock in Disaster, (q) Hazardous Materials for Medical Personal,

26 | (r) The Professional in Emergency Response, (s) Principles of Emergency Management, (t) Effective

27 | Communications, (u) Emergency Program Management – An Orientation to the Position.

28 |     Petitioner participated in and completed a Creative Writing Course in 1999 and 2000.

12

1    Petitioner voluntarily undertook difficult and additional studies in the field of "Microsoft
2 Certified System Engineer," while enrolled in the Vocational Computer and Related Technology
3 Program.

4    Petitioner voluntarily dedicated large amounts of time toward the successful completion and
5 submission of the "VEATA" grant application, including the voluminous research necessary to
6 complete this project.

7    Petitioner, while taking on the above voluntarily and self-assigned tasks and while
8 completing his own mandatory duties and studies while a student in the Vocational Computer and
9 Related Technology Program acted as a "Team Leader," helping others with their studies, sat on
10 class technical review panels and assisted in student lab reviews.

11    Petitioner completed a voluntary and educationally based infectious disease course in
12 HIV/AIDS.

13    Petitioner has been recognized for his repeated and continuing donations and volunteer work
14 in the "Share A Bear" Teddy Bear Drive for children in crisis, sponsored by Sergeant P. Skinner, at
15 Correctional Training Facility from 2003 – 2005.

16 **PSYCHOLOGICAL EVALUATIONS**

17    Petitioner was evaluated by Melvin Macomber, Ph.D. and licensed psychologist in Ione,
18 California (Mule Creek State Prison) in 1999 (Exhibit F) and again in Correctional Training Facility
19 in 2003 (Exhibit E). During both evaluations Petitioner was found to posses a violence potential
20 within a controlled setting at below average in comparison to other inmates... and if released to the
21 community – that potential is no greater then the average individual living in society.  Dr. Macomber
22 specifically found "at this point in his life, there are no significant risk factors which could be a
23 precursor to violence for this inmate." "There is no evidence of mental or emotional problems that
24 would interfere with his being

25 granted a parole date. There is no need for further psychotherapy or counseling."    (Emphasis
26 added.)

27                                **STATUTORY INTERPRETATION**

28    The overriding concern in the decision to grant or deny/withhold a finding of suitability is

13

"public safety." This is a well settled principle of "parole law." Equally well settled, yet rarely complied with, is the evidentiary basis for a finding that a given parole applicant is "currently" unsuitable for parole. This uncertainty is ill-founded.

The legislature has made abundantly clear in Penal Code § 3041(a) and 3041(b) that the Board "shall normally set a parole release date"..."unless it determines   the gravity of the current or past convicted offense or offenses, or the timing and gravity of past or current convicted offense or offenses, is such that consideration of public safety requires a more lengthy period of incarceration." Accordingly, as concluded in Dannenberg II (2007) DJDAR 17131 (6th Dist), it is not just some evidence to support the finding, but some evidence sufficient to satisfy the statute's ultimate test, that is some evidence the release of the Petitioner would subject society to an "unreasonable risk of danger to public safety." Through a long line of judicial decisions it is apparent that such an evaluation is specifically and only relevant to the question of the likelihood of recidivism, and only to the extent it reveals an "unreasonable risk" of same. Therefore, the question is whether the inmate will be able to live in society without committing additional antisocial acts.

As a strong trend in California court decisions show "whether it [the crime] possesses the necessary predictive value depends on the (a) "nature of the crime" and (b) "how long ago it happened." Turning to (a) the nature of the crime, one has merely to look at several Court of Appeals recent decisions to conclude Petitioner's crime does not measure up. For example:

In re Smith (2003) 109 Cal.App.4th 489:

> In this case Smith beat and drowned a man who Smith believed to have been selling bad cocaine to one of Smith's major customers. Smith and others were convicted of kidnap, robbery, and second-degree murder.

In re Scott 133 Cal.App.4th 573:

> This case involved a love triangle where Scott killed his wife's lover. The wife professed to Scott she was going to end the relationship and return to Scott later that night. When she failed to return home, Scott went to the lover's home, finding the two together, shot the lover in the head and thigh.

In re Lee 143 Cal.Ap...4th at 1404:

> Lee sold his restaurant to a man who fell behind in his payments. Lee bought a gun and a box of bullets and wet to the restaurant to collect. Lee purportedly intended to kill the buyer and then himself when the buyer refused to make the payment. Lee drew the gun and fired five rounds

14

1    wounding the buyer and killing the buyer's wife.

2    In re Weider (2006) 145 Cal.app.4th 570:

3    Like in the case of Scott and Lawrence, this case involved a love
triangle. However, the Weider case occurred in the midst of a confusing
4    struggle at a restaurant some two years after the wife had left the husband
for the other man. Weider demanded his wife talk to him or he would kill
5    the other man and himself, he went to his car, retrieved a handgun. He
first fired two errant shots across the restaurant, During the ensuing
6    struggle over the gun not only did the lover receive fatal wounds, but two
others were wounded.

7

8    In re Elkins 144 Cal.App.4th 475:

9    The victim in Elkin's crime was a friend to whom Elkins owe money for
past drug purchases. In the course of the robbery Elkin killed the
10    sleeping victim by beating him with a baseball bat. After stealing money
and property, the victim was placed in a car trunk and driven to an
11    isolated area, where he was dumped.

12    In the instant case, Petitioner and a friend, needing money, went to a store and robbed it. At

13    some point the owner of the store rushed the Petitioner with a two-by-four. Reacting in fear of being

14    hit with a two-by-four, Petitioner fired a single shot, which struck the victim in the forehead, killing

15    him.

16    Turning now to (b), "how long ago it happened," the instant offense occurred on May 23,

17    1983 and Petitioner was sentenced on January 8, 1985. Thus, Petitioner's crime is now over 24

18    years old. Under an evolving trend in California courts, such as in In re Lawrence 2007 WL

19    1475283 (under review in the California Supreme Court and provided for reference only) the length

20    of time between the commission of the crime itself and the filing of this instant petition is of

21    relevance. The Lawrence court concluded that

22    "The commitment crime can lack the power to supply "some evidence"
supporting a denial of parole because of the interplay between two
23    factors, the nature of the crime and the passage of time since its
commission. That is, the fact there is "some evidence" the crime was
24    committed and committed a certain way at a certain time does mean that
crime necessarily represent "some evidence" the prisoner's release on
25    parole will pose an unreasonable risk of danger to the public safety at the
present time. Whether it possesses the necessary predictive value
26    depends on both the nature of the crime and how long ago it happened."

27    In Lawrence, the predictive value was lost after 24 years of incarceration (as in this case) and

28    36 years after the crime was committed.

15

1    Likewise, in the case of In re Elkins, supra, 50 Cal.Rptr.3d at 503, 144 Cal.App.4th 475,

2    Elkins had served 26 years, 11 of which were beyond his minimum for a second-degree murder.

3    In the case of In re Lee 49 Cal.Rptr.3d 931 (Cal.App.2dist. 2006), Lee had served 19 years

4    on a 17 years to life sentence.

5    In the case of In re Weider 52 Cal. 147 (Cal.App.6th Dist. 2006), Weider served 18 years on

6    a 15 years to life sentence, 8 years of which were beyond the regulatory term.

7    In the case of In re Smith 134 Cal.Rptr.2d 781 (Cal.App.2nd Dist.), Smith served 18 years on

8    a 15 years to life sentence, 9 years beyond his regulatory minimum, for a second degree murder,

9    which he reached in 1995.

10    In the case of In re Scott, supra, 34 Cal.Rptr.3d at 905 (Cal.App 1st Dist. 2005), Scott served

11    19 years on a 15 years to life sentence, 9 years beyond his regulatory minimum, for a second-degree

12    murder.

13    In the instant case, Petitioner had served (at the time of the hearing) 20 years of his 27 years

14    to life sentence. *To date, Petitioner has served 7+ years past his regulatory maximum eligible*

15    *release date, under his negotiated and stipulated plea agreement.*

16    Recently, the Sixth Appellate District for the California Court of Appeals once again

17    emphasized and elaborated on the critical distinction between the finding that the commitment

18    offense was "especially heinous, and the nexus that links that finding to the conclusion that the

19    prisoner currently poses an unreasonable risk of danger to society if released. As the In re

20    Dannenberg II, supra, court pointed out, that nexus is "subsequent circumstances." This was the

21    'standard of review' by which the case was legally to be reviewed in the state courts. It was not.

22    Failure to review this case in the state courts under such factors deprived Petitioner of a review

23    comporting with the state's due process protections and resulted in a decision that was contrary to, or

24    involved an unreasonable application of federal law as outlined in Superintendent v. Hill 472 U.S.

25    445, 86 L.Ed 2d 356, 105 S.Ct. 2758 and its some evidence standard. Such failure resulted further in

26    a decision that was unreasonable in light of the evidence in the record depicting a violence free

27    nexus.

28    In deed, there comes a point in the circumstances of a plea agreement when in giving the

16

deference afforded the Board and the Governor by reviewing tribunals, the obligation to uphold the "finding" of unsuitability (where there is "some evidence") does not mean that a court is necessarily bound to uphold the "decision," where there is not even a modicum of evidence that due to the "especially heinous" nature of a given crime the Petitioner is currently an unreasonable risk of danger to society.

True, the "deferential standard of review" may require a court to credit the "finding" if it is supportable that the commitment offense is heinous. However, that fact is not a supportable basis to "eternally" find a prisoner unsuitable, absent a nexus of violence or aggression. In re Dannenberg II, supra (2007) DJDAR 17131. Here, there is no supportable nexus.

## FEDERAL STANDARD OF REVIEW

Federal cases interpreting the 'federal' "some evidence" standard, framed in Biggs v. Terhune 334 F.3d 910, focuses more directly on 'the age of' rather than 'the nature of' the commitment offense.

Furthermore, there is 'suspicion' that there may be a difference between the state's constitutional 'some evidence' and the federal 'some evidence' standard which finds support in Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp 1063. This same Rosenkrantz was denied parole by the California Supreme Court in 2002 under the Californian some evidence test, based solely on the nature of the commitment offense. In ordering Rosenkrantz's release on parole, the federal court relied on Biggs to hold:

> "While relying on Petitioner's crime as an indicator of dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances after nearly two decades of incarceration and a half a dozen parole suitability hearings – violates due process because Petitioner's offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the 'some evidence' standard. After nearly 20 years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or crime is nil."

Another source of reference for validity of the suspicion of difference in the application of the standard can be found in the unpublished case of Johnson v. Finn (E.D. Cal. 2006) 2006 W.L. 195159, which stated:

> "The seriousness of the crime had predictive value for the dangerousness of Petitioner's release for the first, second and perhaps third suitability

17

1                          hearing. But after the years go by, this factor loses its predictive value in
                         light of the growing experience to the contrary (assuming Petitioner's
2                          record in prison is exemplary)." [See Request for Judicial Notice.]

3          Thus, a commitment offense the California Supreme Court had found 'serious enough' to

4 supply 'some evidence' under the California Constitution to justify a Governor's rejection of parole

5 was fund too old to satisfy the Federal Constitution's 'some evidence' test by the federal court.

6         Another such case was Martin v. Marshall (N.D. Cal. 2006) 431 F.Supp.2d 1038, 1048,

7 where the Northern District also found am aging commitment offense fell short of providing 'some

8 evidence' sufficient to justify a denial of parole. In Martin, supra, the Governor reversed a parole

9 release date by the Board. In this case, the petitioner had not only killed one person, but two – and

10 wounded a third, in 1979. Yet, he was only convicted of second-degree murder the District Court

11 pointed out the 'some evidence' grounds applied equally to the Board's decision and the Governor's

12 review. The court discounted the Governor's characterization of the commitment offense as

13 showing a "callous disregard" for human life and relied upon Biggs' reasoning about why a

14 commitment offense cannot sustain a dangerousness finding forever. Under that reasoning…

15                          "Petitioner cannot change the past, denying petitioner parole based only
                         on the facts surrounding the crime itself effectively changes his sentence
16                          from twenty-years-to-life into life imprisonment without the possibility of
                         parole."

17

18         This case presents a stronger case for release than Biggs for several reasons. First, and more

19 importantly, Petitioner's commitment offense was far less serious than that of the petitioner in Biggs.

20 The Biggs murder involved a violent, manipulative, and premeditative murder, while this Petitioner

21 acted impulsively and at least in part, in response to the circumstances of the victim approaching

22 Petitioner violently with a two-by-four. Second, the Biggs petitioner had not served the full terms of

23 his sentence, while Petitioner has exceeded those terms implied and specifically outlined in both the

24 plea agreement and controlling state precedent on the subject matter, by at least 6 years at the time of

25 the hearing being challenged. The Petitioner here has demonstrated exemplary behavior and

26 evidence of rehabilitation as required by the Biggs court, for a significant period of time…and has

27 never received a disciplinary for violence or violent aggression. Therefore, the sole reliance on

28 Petitioner's commitment offense, in denying him parole, impinges on Petitioner's constitutionally

18

protected liberty interest, as parole applied to Petitioner at the time he accepted the "bargain" and the court sentenced him.

The United States Supreme Court decisions [Greenholtz v. Nebraska (1979) 442 U.S. 1, 12 and Board of Pardons v. Allen (1989) 482 U.S. 369, 387, held that federal due process creates a Constitutional Liberty Interest for convicted persons in certain jurisdictions. The existence of a right depends on whether the state employs "mandatory language" indicating parole will be granted if certain findings are made. In 2002, the Ninth Circuit examined the California Parole Scheme in McQuillion v. Duncan (9th Cir. 2002) 306 F.3d 895, and found "it" uses mandatory language and is largely parallel to the scheme found in Greenholtz and Allen. Accordingly, the McQuillion court found a "liberty interest" was created under the Federal Constitution for state prisoners in California.

In 2003, the federal court poured some content into the federal right in Biggs, holding the "liberty interest" protected under the Federal Constitution, "is created not upon the grant of a parole date, but upon the incarceration of the inmate." Thus, the liberty interest exists at the time of the Parole Board or Governor determines    whether the prisoner is too dangerous to consider setting a parole date.

Going further, that court found that "in the parole context, the requirements of due process are satisfied if 'some evidence' supports the decision" and applies to parole denials based primarily on the nature of the commitment offense.

19

**PRAYER**

Based on the foregoing, Petitioner, Paul Cleveland, prays this Court:

1) Issue an Order to Show Cause, returnable to this Court;

2) Appoint Council;

3) Issue a Writ of Habeas Corpus;

4) Conduct an Evidentiary Hearing;

5) Issue an order directing Petitioner's release on parole pursuant to Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910; McQuillion v. Duncan, (9th Cir. 2003) 342 F.3d 1012;

6) Declare the rights of the parties;

7) Grant all other relief necessary to promote justice and its ends.

Dated: January __/ ˙7__, 2008

Paul Cleveland, Petitioner
In Pro Per

20

# EXHIBIT A

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

| Date: | MAY 1, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004260

In re,
PAUL CLEVELAND,
Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered petitioner's Writ of Habeas Corpus filed on September 11, 2006. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that petitioner is unsuitable for parole (See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667 (hereafter *Rosenkrantz*).)

Petitioner was received into custody on January 29, 1985 after being convicted of first-degree murder with use of a firearm. Petitioner received a term of twenty-five years to life plus two years with a minimum eligible parole date of March 22, 2001. The commitment offense occurred on May 23, 1983. At that time, petitioner was having difficulty finding a job and meeting his expenses. Petitioner and a crime partner decided to rob a market at gunpoint. The cashier ran to the back of the store to tell her husband, who was the owner, that they were being robbed. The owner picked up a two by four and threatened to hit petitioner. Petitioner shot him in the head, killing him. Petitioner and his partner drove back to his home where they were counting the stolen money when police arrived.

The Board found petitioner unsuitable for parole after a parole consideration hearing held on March 15, 2006. Petitioner was denied parole for three years. The Board concluded that petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors, including the commitment offense.

The Court finds that there is some evidence to support the Board's finding that "the motive for the crime is inexplicable or very trivial in relation to the offense" (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(E).) "To fit the regulatory description, the motive must be materially less significant (or more "trivial") than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily present." (*In re Scott* (2004) 119 Cal.App.4th 871, at 893). In this case the motive for the first-degree murder was robbery. The Board was justified in determining that the "motivation to obtain money" is materially less significant than those which conventionally drive people to commit murder. (*In re Honesto* (2005) 130 Cal.App4th 81, 95.)

The Board relied on additional factors in denying parole at this time. They were concerned that his "institutional activities did not indicate an enhanced ability to function within the law upon release" " (Cal.

1

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | MAY 1, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

| | (Parties and Counsel checked if present) |
|---|---|
| BH004260 | |
| In re, | |
| PAUL CLEVELAND, | Counsel for Petitioner: |
| Petitioner, | |
| | Counsel for Respondent: |
| On Habeas Corpus | |

Code Regs., tit. 15, §2402, subd. (d)(9).) They noted that he had several CDC 115s in recent years for smoking violations. He claimed that he intentionally violated the rules in order to get the 115s, which kept him out of the prison dormitory. While the Board acknowledged that these violations were not violent in nature, they were concerned about petitioner's manipulative conduct and how it would translate to life outside the prison. (*Reporter's Transcript*, March 15, 2006, p. 69.) The Board also worried that petitioner has not done enough programming in prison and needed additional self-help and therapy in order to "cope with stress in a non-destructive manner." (*Id* at 67.) He did not start programming until 2000, making his gains too recent to predict future conduct. (*Id* at 70.) There is some evidence to support the Board's finding that petitioner must be able to demonstrate an ability to maintain these gains over an extended period of time.

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to send notice.

A true copy of this minute order is sent via U.S. Mail to the following parties:

Paul Cleveland
C-99765
Correctional Training Facility, Soledad
P.O. Box 689
Soledad, CA 93960-0689

Department of Justice
Office of the Attorney General of the State of California
110 West A. Street, Suite 1100
San Diego, CA 92101
Attn: Ms. Cynthia Lumely

2

| Minutes Entered |
|---|
| 05-01-07 |
| County Clerk |

# EXHIBIT B

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

COURT OF APPEAL · SECOND DIST.

F I L E D

DIVISION SEVEN

SEP **25** 2007

JOSEPH A. LANE                    Clerk

E. McCLINTOCK          Deputy Clerk

In re

B202236

(Super. Ct. No. A700006)

PAUL CLEVELAND

on Habeas Corpus.

ORDER

THE COURT*:

The petition for writ of habeas corpus filed herein September 20, 2007 has been read and considered. The petition is denied. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 667; *In re Dannenberg* (2005) 34 Cal.4th 1061.)

*PERLUSS, P.J.,                JOHNSON, J.,                WOODS, J.

EXHIBIT C

Court of Appeal, Second Appellate District, Div. 7 - No. B202236
**S156864**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re PAUL CLEVELAND on Habeas Corpus

The petition for review is denied.

SUPREME COURT
FILED

NOV 2 8 2007

Frederick K. Ohlrich Clerk

_____
Deputy

GEORGE

_____
Chief Justice

# EXHIBIT D

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:               )     CDC Number C-99765
                          )
PAUL CLEVELAND            )
                          )
_____)



CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MARCH 15, 2006

12:15 P.M.

PANEL PRESENT:

Ms. Tracey St. Julien, Presiding Commissioner
Mr. Rolando Mejia, Deputy Commissioner

OTHERS PRESENT:

Mr. Paul Cleveland, Inmate
Mr. David Spowart, Attorney for Inmate
Mr. James Jacobs, Deputy District Attorney
Correctional Officer Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum

P. M. LaChapelle, Peters Shorthand Reporting

ii

## INDEX

PAGE

Proceedings........................................... 1

Case Factors.......................................... 8

Pre-Commitment Factors............................... 10

Post-Commitment Factors.............................. 36

Parole Plans......................................... 21

Closing Statements................................... 52

Recess............................................... 64

Decision............................................. 65

Adjournment.......................................... 73

Transcriber Certification............................ 74

--oOo--

1

1          P R O C E E D I N G S

2          DEPUTY COMMISSIONER MEJIA:  Okay, we're

3     now on record.

4          PRESIDING COMMISSIONER ST. JULIEN:  Okay,

5     good afternoon.

6          INMATE CLEVELAND:  Morning or afternoon.

7          PRESIDING COMMISSIONER ST. JULIEN:  The

8     time is 12:15 and we are having a Subsequent

9     Parole Hearing for Paul Cleveland, CDC Number C-

10    99765.  Today is March 15, 2006.  We are at CTF,

11    Soledad.  Mr. Cleveland was received on January

12    29, 1985, life term starting the same day, Count

13    One, murder first with the use of a firearm,

14    Penal Code sections 108 and 187 and 12022.5,

15    term received 25 years to life plus two years,

16    minimum eligible parole date March 22, 2001.

17    This is from the County of Los Angeles, Case

18    Number A700006.  Is that correct?

19         INMATE CLEVELAND:  Yes.

20         PRESIDING COMMISSIONER ST. JULIEN:  Okay.

21    We're tape recording the Hearing.  So the

22    transcriber will know who's speaking, we'll go

23    around the room and say our first and our last

24    names, and spell our names, the reason why we're

25    here, and when it's your turn, sir, will you

26    also state your CDC Number.

27    My name is Tracey St. Julien, T-R-A-C-E-Y S-T.

1  J-U-L-I-E-N, Commissioner.

2      **DEPUTY COMMISSIONER MEJIA:**  Rolando

3  Mejia, M-E-J-I-A, Deputy Commissioner.

4      **DEPUTY DISTRICT ATTORNEY JACOBS:**  James

5  Jacobs, J-A-C-O-B-S, Deputy District Attorney,

6  Los Angeles County.

7      **ATTORNEY SPOWART:**  David Spowart, S-P-O-

8  W-A-R-T, attorney for Mr. Cleveland.

9      **INMATE CLEVELAND:**  Paul Cleveland, C-L-E-

10  V-E-L-A-N-D, C-99765.

11      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

12  And we also have one Correctional Officer in the

13  room who's here for security purposes.  And Mr.

14  Cleveland, your attorney just went over the

15  accommodation for disabilities and the Hearing

16  opening procedure with you?

17      **INMATE CLEVELAND:**  Yes.

18      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

19  And -- that we have describing those two issues,

20  and I'm looking at it and notice that you both

21  have signed it.  Now I also looked at your BPT

22  Form 1073 that you signed on April 25, 2005

23  indicating that you do not have any disabilities

24  that would prevent you from attending the

25  Hearing.

26      **INMATE CLEVELAND:**  That's correct.

27      **PRESIDING COMMISSIONER ST. JULIEN:**

3

1    That's correct, okay.  And I notice that you

2    have eyeglasses on so if you need -- you need

3    the glasses you have on.

4         **INMATE CLEVELAND:**  There just for reading

5    glasses.

6         **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

7    Okay, and usually here at CTF, we have the

8    luxury of two officers.  We don't always have

9    that.  Usually we do have that, but today we

10   don't so that's you're in restraints.  But if

11   you need -- I notice you have a folder of

12   documents in front of you, so if you need any

13   help negotiating your hands or whatever

14   (indiscernible)  Okay?

15        **ATTORNEY SPOWART:**  We regard to that

16   matter, Commissioner, on the record, I object to

17   having my client (indiscernible) indicate that

18   he's some kind of a danger.

19        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

20   We do not interpret that that he is a danger.

21   We know he is in prison.  We know why he's in

22   prison, and it doesn't have any effect on me --

23        **DEPUTY COMMISSIONER MEJIA:**  Just

24   following policy.

25        **PRESIDING COMMISSIONER ST. JULIEN:**  Yeah,

26   it's just the policy that if there is two

27   officers --

4

1          **ATTORNEY SPOWART:**  I just want it on the
2     record --

3          [indiscernible - both Commissioner St.
4     Julien and Mr. Spowart talking at once]

5          **PRESIDING COMMISSIONER ST. JULIEN:**  I
6     understand and I'm just --. the policy is that
7     there's two officers and there's restraints if
8     there's only one officer. And it's not anything
9     that any of us (indiscernible) It's just that,
10    you know, the Department's policy so, okay.

11         **ATTORNEY SPOWART:**  One other think, sorry
12    to --

13         **PRESIDING COMMISSIONER ST. JULIEN:**
14    That's okay.

15         **ATTORNEY SPOWART:**  I don't know if you
16    have it but I've got a notification on my Board
17    packet here that a current Board report and
18    addendum has been requested (indiscernible). I
19    don't have it. Do you have it?

20         **PRESIDING COMMISSIONER ST. JULIEN:**  Yeah,
21    no, that's -- we (indiscernible) for that
22    earlier too. And we -- I don't have it and I
23    don't think -- we were looking for that
24    (indiscernible) and I don't think we ever --

25         **DEPUTY COMMISSIONER MEJIA:**  We don't have
26    it, so we'll just go with the other. That's why
27    you're given the ability to send me additional

5

1   documents (indiscernible)

2         **PRESIDING COMMISSIONER ST. JULIEN:** Now

3   do you have, in you're your folder there, do you

4   have your latest chronos or anything like that?

5         **INMATE CLEVELAND:** Yes, yes, I do.

6   Chronos and certificates, letters of support.

7         **PRESIDING COMMISSIONER ST. JULIEN:** Okay,

8   when Mr. -- when Commissioner Mejia gets to that

9   section, and if there's something there that he

10  doesn't have, that you've have or you've done,

11  in that period of time, then if you can let him

12  see what you have and explain it to him.

13        **DEPUTY COMMISSIONER MEJIA:** As long as

14  it's for 2002 to the present time.

15        **ATTORNEY SPOWART:** He's got it pretty

16  well laid out in parole plans, (indiscernible)

17  all his accomplishments.

18        **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

19  Could we -- do you want us to take a look at

20  that now?

21        **ATTORNEY SPOWART:** Yeah.

22        **INMATE CLEVELAND:** (indiscernible)

23        **PRESIDING COMMISSIONER ST. JULIEN:** And

24  maybe -- I do parole plans and Commissioner

25  Mejia does other post-conviction so that's why

26  I'm sharing this, okay. Okay, so this would be

27  additional documents. Do you have anything

6

1   else? Any additional documents for today?

2         **ATTORNEY SPOWART:** I have nothing

3   further.

4         **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

5   (indiscernible) Okay, so Mr. Spowart, are you

6   satisfied that your client's ADA rights have

7   been met?

8         **ATTORNEY SPOWART:** Yes.

9         **PRESIDING COMMISSIONER ST. JULIEN:** Okay,

10  thank you. Okay. And again, Mr. Cleveland, if

11  you have any questions -- do you have any

12  questions now about the Hearing procedure?

13        **INMATE CLEVELAND:** No, I don't.

14        **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

15  If at any point in time, you need to correct or

16  clarify anything in the comments we make, please

17  feel free to do so. And I note that I received

18  the Exhibit Checklist back, marked Exhibit "1."

19  And does that list (indiscernible) gentlemen?

20        **ATTORNEY SPOWART:** I have those.

21        **DEPUTY DISTRICT ATTORNEY JACOBS:** Yes.

22        **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

23  And Mr. Cleveland, you also have the right to be

24  heard by a fair and impartial Panel. Now that

25  you've seen the Panel here today, do you have

26  any objections?

27        **INMATE CLEVELAND:** I don't know the

7

1    background of either one of you on the Panel.  I
2    object in general to the Panel being consisted
3    of primarily ex-police officers, politicians and
4    victim's rights advocates, which is not what the
5    Penal Code suggests when I went to prison, but
6    individually, I have no objections to either one
7    of you.  I don't know your backgrounds.

8         **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
9    Well, the objection would be if you had any
10   reason to believe that we couldn't be fair and
11   impartial toward you.

12        **INMATE CLEVELAND:**  I have no reason to
13   believe that.

14        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
15   And for you, so you know, I'm the only one on
16   the Board who doesn't have any (indiscernible)
17   experience, okay.  (indiscernible) political
18   experience there.  But I don't have any law, I'm
19   not a law enforcement (indiscernible) so, okay.

20        **DEPUTY COMMISSIONER MEJIA:**  I have 21
21   years as (indiscernible)  I have no pre-
22   conceived notion of how this (indiscernible) say
23   what you want to say, make a decision
24   (indiscernible)

25        **ATTORNEY SPOWART:**  I might have any
26   objection to either one of you, but it's what
27   the Board's made up entirely so there's really

8

1  not a lot (indiscernible) selection or anything.

2          **PRESIDING COMMISSIONER ST. JULIEN:**

3  You've got an exception here, okay.  Okay,

4  anyway.  Do you have any preliminary objections?

5          **ATTORNEY SPOWART:**  I have none.

6          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

7  And will Mr. Cleveland be speaking with us

8  today?

9          **ATTORNEY SPOWART:**  Yes.

10          **INMATE CLEVELAND:**  Yes.

11          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

12  I'm going to give you an oath, sir.  Do you

13  solemnly swear or affirm that the testimony you

14  give today will be the truth, the whole truth

15  and nothing but the truth?

16          **INMATE CLEVELAND:**  I do.

17          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

18  thank you.  I'll start by reading the summary of

19  the crime as it appears in the August 2005 Board

20  report.  And it states that on May 23, 1983, Mr.

21  Cleveland and Mr. Bines, B-I-N-E-S, drove to the

22  Corrigan (phonetic) Market located at

23  (indiscernible), parked in the rear of the

24  store.  Cleveland went inside the market and

25  exhibited his gun, robbing, Sung Lee, and that's

26  S-U-N-G, last name L-E-E.  Sung Lee went to the

27  back of the store to advise her husband, Joong

```
 1  Lee, J-O-O-N-G, last name L-E-E, that they were
 2  being robbed.  Joong picked up a two by four and
 3  came to Cleveland.  Cleveland fired one round
 4  from his 38 caliber handgun at Joong Lee.  The
 5  witness, who was driving through the parking lot
 6  of the market, observed Cleveland running out of
 7  the store and through the alley next to the
 8  store.  She followed a car and wrote the license
 9  of the vehicle on her hand as she
10  x(indiscernible) enter a Ford -- she saw
11  Cleveland enter a Ford, I guess, and drive away.
12  She gave this information to the police who came
13  to the scene.  Shortly thereafter, officers were
14  able to locate Cleveland at Cleveland's
15  residence where he and Bines had split the
16  money, and then hid the gun in the garage where
17  co-defendant Bines was staying.
18  The victim was taken to the emergency room at
19  West Park Hospital where he was pronounced dead.
20  (indiscernible) Coroner's Office determined that
21  the cause of death was the result of a single
22  gunshot wound to the head of the victim.
23  And is that an accurate description of what
24  happened?
25      INMATE CLEVELAND:  Yes, it is.
26      PRESIDING COMMISSIONER ST. JULIEN:  Okay.
27  And now I read your version and your documents
```

10

1    in the Board report and I found your background

2    to be quite different than what we usually see.

3    Were you in the service for -- how many years

4    were you in the Army?

5        INMATE CLEVELAND:  I was in the Army

6    Reserve from '77 -- excuse me, from '75 to '77

7    and the regular Army from '77 to 1980.

8        PRESIDING COMMISSIONER ST. JULIEN:  Okay.

9    So it was several years.  And you had juvenile

10   probation for robbery?

11       INMATE CLEVELAND:  No, I got juvenile

12   probation for siphoning gasoline.

13       PRESIDING COMMISSIONER ST. JULIEN:  Okay.

14   Was it described as robbery?

15       INMATE CLEVELAND:  I think it was

16   described as a second degree burglary.

17       PRESIDING COMMISSIONER ST. JULIEN:  Oh,

18   okay.  (indiscernible)  Okay, and no other

19   criminal offenses?

20       INMATE CLEVELAND:  No.

21       PRESIDING COMMISSIONER ST. JULIEN:  Okay.

22   So, what happened?  What happened -- were you

23   planning on a career in the military?

24       INMATE CLEVELAND:  No, I had -- once I

25   finished my -- I had gotten married and went

26   into the active service.  During the time of

27   that service, I got divorced and just finished

1   off my tour of duty and was (indiscernible)

2        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

3   And then what did you plan on to do next?

4        **INMATE CLEVELAND:**  Well, I didn't have my

5   job in what's called that intelligence.  I

6   didn't have a related civilian field, so I tried

7   out and went through several different jobs

8   (indiscernible) finishing and things like that.

9   I was kind of (indiscernible) along trying to

10  find my place, which is what -- I wasn't very

11  successful at it.  It put me in the straights I

12  was in at the time that I committed this crime.

13       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

14  So, now when you left the service, or you were

15  planning to leave, you made the decision not to

16  resign or -- what did you think you were going

17  to do?

18       **INMATE CLEVELAND:**  About the time, my

19  father had a label manufacturing business and I

20  thought I would work for him.  But he had

21  subsequently sold the business.

22       **PRESIDING COMMISSIONER ST. JULIEN:**  Was

23  that in California?

24       **INMATE CLEVELAND:**  No, it was in

25  (indiscernible)

26       **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

27  So, how did you get to the point where

12

1   apparently you needed the money so badly that

2   rob -- the idea of robbing a liquor store was a

3   good idea?

4        INMATE CLEVELAND:  Well, as I said, I had

5   attempted a lot of different jobs and it was to

6   the point where I couldn't find work.  They just

7   had no work.  The economy was bad then, it's a

8   poor excuse for anything but I couldn't find a

9   job that would even pay above minimum wage, to

10  help pay my bills.

11       PRESIDING COMMISSIONER ST. JULIEN:  Did

12  you think of re-enlisting?

13       INMATE CLEVELAND:  I had considered it.

14       PRESIDING COMMISSIONER ST. JULIEN:  Or

15  did you --

16       INMATE CLEVELAND:  But I was -- at the

17  time, in the peacetime Army, they were spending

18  more time getting people out than bringing them

19  in.  It wasn't really an option

20       PRESIDING COMMISSIONER ST. JULIEN:  Okay.

21  So, did you have any -- I didn't make note of

22  any (indiscernible) alcohol.  Did you use

23  substances or --

24       INMATE CLEVELAND:  I had experimented

25  with many drugs, nothing --

26       PRESIDING COMMISSIONER ST. JULIEN:  Did

27  anything become a habit?

13

1          **INMATE CLEVELAND:**  No, I don't think I've
2     ever had a habit.  I smoked a lot of marijuana.
3     I don't believe it was habitual.  Experimented
4     with many other drugs.  I drank occasionally.  I
5     was never much of a drinker.

6          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
7     So, you were down on your luck pretty much.

8          **INMATE CLEVELAND:**  Down  on my luck and I
9     had a poor choice of friends that I had made.

10          **PRESIDING COMMISSIONER ST. JULIEN:**  And
11    where did you meet these friends?  Were they in
12    the service with you?

13          **INMATE CLEVELAND:**  No, the people I met
14    when I moved into San Fernando Valley that I --
15    the same little houses that we partied in and
16    things like that.  You know, just a social
17    circle.  And unfortunately, Mr. Bines, he's an
18    ex-con and I had thought about committing a
19    robbery and things like that.  He was kind of
20    pointing in the direction of this particular
21    crime.

22          **PRESIDING COMMISSIONER ST. JULIEN:**  Now
23    did you think that this was a viable
24    alternative?

25          **INMATE CLEVELAND:**  Unfortunately, I was
26    stupid enough to have seen it on TV and things
27    -- people got away with things.

14

1        PRESIDING COMMISSIONER ST. JULIEN:  Okay.

2   Now, that's what I read in there and I just

3   really have to scratch my head at that because

4   I've lived in LA during, you know, I've lived in

5   LA, and you heard about, especially career

6   (indiscernible).  You heard about shootings in

7   liquor stores all the time.  And so when I read

8   -- so when I read that you saw it on TV and it

9   seemed like stores were being robbed and nobody

10  was getting hurt, I --

11        INMATE CLEVELAND:  That's what I honestly

12  believed.

13        PRESIDING COMMISSIONER ST. JULIEN:  -- I

14  just didn't, I just didn't (indiscernible -

15  voice over)

16        INMATE CLEVELAND:  You know the thought

17  of a Korean market or anything, that was never a

18  part of it.  It was a market --

19        [indiscernible - both talking at once]

20        INMATE CLEVELAND:  But no, that's what I

21  had honestly believed.  I thought I could, you

22  know, go do this and get away with it.  Nobody

23  would be hurt.

24        PRESIDING COMMISSIONER ST. JULIEN:  How

25  much money did you think you'd get.

26        INMATE CLEVELAND:  Well, it's -- Mr.

27  Bines had told me that if I check -- cash their

15

1   paychecks. So, I thought --

2        PRESIDING COMMISSIONER ST. JULIEN:

3   (indiscernible)

4        INMATE CLEVELAND:   -- substantial amount

5   of money.

6        PRESIDING COMMISSIONER ST. JULIEN:   How

7   much did -- and I don't think -- how much did

8   you ever get?

9        INMATE CLEVELAND:   Oh, approximately

10  $100.

11        PRESIDING COMMISSIONER ST. JULIEN:   Okay.

12  So, another troubling thing for me, and maybe

13  somebody else has mentioned to you, but it was

14  troubling when you guys shot Mr. Lee, and then

15  you take the money, you go home and you're

16  divvying up the money.

17        INMATE CLEVELAND:   Well, at this time,

18  you know, I'd like to say -- I came in here with

19  the intention of not discussing the crime.  I

20  stipulated to the crime. I pled guilty.  I

21  confessed to the police the day that I did it.

22  I pled guilty.  And I don't see any reason to

23  continue to rehash this.  I did this.  I ended

24  Mr. Lee's life.  I've never once tried to say

25  anything different.  I'm sorry for what I did,

26  and I'm extremely sorry for what I did to his

27  family, my family and (indiscernible) like

16

1   friends.  But to discuss this crime over again

2   is --

3         PRESIDING COMMISSIONER ST. JULIEN:   And

4   that's your right and that's fine, but I will

5   just comment that it is definitely your right to

6   discuss or not discuss whatever you want to.

7   And it might seem like rehashing to you, and

8   unfortunately (indiscernible), you're usually

9   faced with different Panels all the time.  But

10  this is really the only process and the only

11  opportunity we have to really kind of gage, you

12  know, the person you were then, and how you

13  thought, what you did, and the progress, and

14  hopefully, there's been progress, you know, and

15  how you have evolved (indiscernible - voice

16  over).

17        INMATE CLEVELAND:   I understand what

18  you're saying.

19        PRESIDING COMMISSIONER ST. JULIEN:   So,

20  that's -- so, what I'm saying is if you don't

21  want to -- I won't just ask you any more

22  questions about it, but I just wanted you to

23  know that it's not, you know, something that

24  we're trying to get you on or -- it's basically

25  just to gage -- to have the benefit of what you

26  were thinking then.

27        INMATE CLEVELAND:   I don't believe that

17

1    you're attempting to try and trap me or anything

2    like that, but, you know, it's a matter of

3    record and anything that the police could come

4    up with, it's true.

5         **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

6         **INMATE CLEVELAND:**  I'm the one who told

7    the police (indiscernible)

8         **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

9    so then why don't we -- why don't I phrase it

10   this way.  Can you compare or contrast the

11   person you were then, your thought process, who

12   you were then and who you are now?

13        **INMATE CLEVELAND:**  Obviously, without a

14   doubt, because then I was an aimless person.  I

15   was just wondering through life.  I really

16   didn't have a set goal, didn't have -- I don't

17   know how to phrase it.  Everything I was trying

18   to achieve, except pay my rent the next day, and

19   I wasn't giving any thought to the future.  And

20   unfortunately, this happened, and now I give

21   nothing but thought to it.  And (indiscernible)

22   my actions suit other people, I had never given

23   any consideration to what I might do would

24   affect anyone.

25        **PRESIDING COMMISSIONER ST. JULIEN:**  And

26   why do you think that was?

27        **INMATE CLEVELAND:**  Cause I was self-

18

1    centered individual and I was very immature.

2          PRESIDING COMMISSIONER ST. JULIEN:  Okay.

3    So, you had -- you had quite a few brothers and

4    sisters, six all together?

5          INMATE CLEVELAND:  Five, or three sisters

6    and two brothers.

7          PRESIDING COMMISSIONER ST. JULIEN:  Okay.

8    So, usually in a family, a big family, you got

9    -- you're forced to think about other people's

10   -- so, I mean -- why don't you just explain a

11   little bit about growing up.

12         INMATE CLEVELAND:  Oh, when I grew up, we

13   were spaced almost three years apart.  So, my

14   oldest brother and my oldest sister were pretty

15   much gone by the time -- in fact, my next oldest

16   brother, he went in the Marine Corp in the Viet

17   Nam era.  The three of them were gone almost

18   before I was ten.  But we had, you know, a

19   stable life.  My father, you know, both my

20   mother and my father worked.  We had, I'd say an

21   upper middle-class family.  It provided

22   everything that we needed.  I can't say that I

23   was ever lacking for anything.  I'm probably one

24   of the few cases you have come in here that had

25   an intact family that was, you know, had

26   reasonable amount of money and every

27   opportunity.  Unfortunately, I squandered every

1    other opportunity, but they were there.

2         **PRESIDING COMMISSIONER ST. JULIEN:**  So,

3    why do you think that was?  You say you didn't

4    have that much caring about what other people

5    were doing and the effect you would have on

6    others, why do you think that was?

7         **INMATE CLEVELAND:**  It was just

8    (indiscernible) I was self-centered.  I was

9    thinking primarily about what was going to make

10   me better, you know, what I could do to fix my

11   current problems.  What I had to do to face

12   tomorrow in order, you know, to get the guy that

13   ran, in order to make gasoline money.  I was

14   just fixating on what I needed to do to get by

15   the next day.

16        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

17   And so then how old were you when you went to

18   the service?

19        **INMATE CLEVELAND:**  Seventeen, initially.

20   In boot camp, I was seventeen.

21        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

22   And your parents lived in Oakland, in the Bay

23   Area.

24        **INMATE CLEVELAND:**  No, at that time, they

25   lived in Washington.  That was around the

26   Vancouver area.

27        **PRESIDING COMMISSIONER ST. JULIEN:**  Oh, I

20

1    got the impression that they -- that you were

2    raised in California (indiscernible)

3         **INMATE CLEVELAND:** Part of the time.

4    Part of the time, till about 8th grade, I was

5    raised in California, then we moved to

6    Washington.

7         **PRESIDING COMMISSIONER ST. JULIEN:** Oh,

8    okay. So, why don't you tell me about the rest

9    of your siblings?

10        **INMATE CLEVELAND:** Currently, my youngest

11   sister was killed in an automobile accident, and

12   see, my next oldest sister is disabled. She has

13   a neuromuscular disorder. My next oldest

14   brother Christopher, he's working with older

15   people, the elderly, as a caretaker. My oldest

16   brother, Mark, is a truck driver in Washington.

17   He has a family. His children are grown. And

18   Mark -- my sister lives in Crockett, California.

19   She was an accountant, she's now a school

20   teacher in a Christian school. She has three or

21   four children, they're all grown -- three

22   children, they're all grown.

23        **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

24   So, you still have your mother?

25        **INMATE CLEVELAND:** Yes, she's about 83.

26        **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

27   And you had one marriage?

21

1          INMATE CLEVELAND:  Yes.

2          PRESIDING COMMISSIONER ST. JULIEN:  And

3   you're divorced?

4          INMATE CLEVELAND:  Yes.

5          PRESIDING COMMISSIONER ST. JULIEN:  Okay.

6   And no children?

7          INMATE CLEVELAND:  No children.

8          PRESIDING COMMISSIONER ST. JULIEN:  Okay.

9   Now, so how old were you when you came to prison

10  on this case?

11          INMATE CLEVELAND:  Twenty-five.  I had

12  just turned twenty-five.

13          PRESIDING COMMISSIONER ST. JULIEN:  Okay.

14  So, parole plans, you would want to move to

15  Washington?

16          INMATE CLEVELAND:  Actually, I'd like to

17  -- given the opportunity, I'd like to live with

18  my sister in Crockett.  Washington would be

19  optimum but I owe restitution still, so I

20  wouldn't be allowed to leave the State.  So,

21  I --

22          PRESIDING COMMISSIONER ST. JULIEN:  You

23  know how much you still owe?

24          INMATE CLEVELAND:  Oh, gees, totally, a

25  little under $8,000.  They didn't start

26  collecting it until 1996 something like that.

27          PRESIDING COMMISSIONER ST. JULIEN:  Is it

22

1  a (indiscernible)

2      INMATE CLEVELAND:  Right (indiscernible)

3      PRESIDING COMMISSIONER ST. JULIEN:  Okay.

4  So, do you know if Washington has an interstate

5  (indiscernible)

6      INMATE CLEVELAND:  They do and I

7  attempted to transfer, but again, the

8  restitution prevented me from transferring.

9      PRESIDING COMMISSIONER ST. JULIEN:  Okay.

10  So chances are you will be here until -- when

11  you get out and have your restitution settled?

12      INMATE CLEVELAND:  Correct.

13      PRESIDING COMMISSIONER ST. JULIEN:  And

14  how do you feel about that?  How do you fell

15  about having to pay the restitution?

16      INMATE CLEVELAND:  Oh, I really don't

17  have a problem with it.  To tell you the truth,

18  I don't know what it's for, but (indiscernible)

19      PRESIDING COMMISSIONER ST. JULIEN:  Goes

20  to the victims.

21      INMATE CLEVELAND:  Oh, and I hope that it

22  does, and I hope they get every penny of it.

23      PRESIDING COMMISSIONER ST. JULIEN:  Yeah,

24  no, I don't think it goes to --

25      INMATE CLEVELAND:  I have no objection to

26  paying, you know, to pay the restitution.  It's

27  part of the sentence, you know, I mean, I really

1    don't even have a problem with the sentence
2    cause what I did, I should receive a harsh fine
3    too.  So, and restitution's part of it and I
4    really don't have a problem with that.  You
5    know, I would like to not pay it, of course,
6    but, you know, just because it -- I end up with
7    $20 a month out of my paycheck, but it's another
8    part of my punishment so I (indiscernible) with
9    that.

10          PRESIDING COMMISSIONER ST. JULIEN:  Okay.
11    And so it's your sister Martha --

12          INMATE CLEVELAND:  In Crockett.

13          PRESIDING COMMISSIONER ST. JULIEN:   --
14    that you want, okay.  And where is that?

15          INMATE CLEVELAND:  That's at the Delta by
16    the Bay Area, east Bay Area.

17          PRESIDING COMMISSIONER ST. JULIEN:  Oh,
18    okay.  She's the one who is a teacher there?

19          INMATE CLEVELAND:  Correct.

20          PRESIDING COMMISSIONER ST. JULIEN:  And
21    then -- it would be in here.  So, what are your
22    plans for employment?

23          INMATE CLEVELAND:  Well, I have a job
24    opportunity through my brother's business, small
25    (indiscernible).  He does -- creates plays and
26    things like that for schools, churches, things
27    like that.  It's an internet-based company.

1       PRESIDING COMMISSIONER ST. JULIEN:  Oh,
2  so that would enable you to live in California?
3       INMATE CLEVELAND:  Yeah, I could do that
4  anywhere but like he said in his job offer, you
5  know, (indiscernible) for a few times a year for
6  equipment upgrades and new software, you know,
7  like that.

8       PRESIDING COMMISSIONER ST. JULIEN:  Okay.
9  So, we have -- I'll go to your letters now.  We
10  have a letter from your brother Christopher,
11  Christopher Cleveland, Vancouver, Washington,
12  and he says, I'm writing to show proof of a job
13  offer for Paul Cleveland.  Ours is growing
14  family-owned business, which is focused on
15  schools, churches, (indiscernible)
16  organizations, et cetera.  (indiscernible) cost
17  patterns, et cetera, via the internet.  We are
18  operating out of a small space in a home office
19  and anticipate expansion, and thought it would
20  be preferable to have Paul here in Washington to
21  add (indiscernible) network control operator.
22  There is no reason his duties cannot be
23  performed anywhere in the world via the
24  internet.  We hope he would receive permission
25  to visit as many as four times a year for
26  software and equipment evaluation and upgrades.
27  We are prepared to pay his (indiscernible)

     1   annual salary, $32,000 a years and this is
     2   assistant -- I'm sorry, in addition to assisting
     3   with his location and training. And as the
     4   company grows, so will Paul's compensation. And
     5   they also say that they are school training
     6   sessions that you can attend at various colleges
     7   and list those. And he also says that if you
     8   were able to go to the State of Washington that
     9   they would give you room and board and a car.
    10   Okay, and, of course, they ask you for parole --
    11   or ask us for parole.
    12   Okay, then I'm just going to go through the
    13   letters in your -- and then we have another
    14   letter from Philip and Janice, is it Prater?
    15        **INMATE CLEVELAND:** Prater, yes.
    16        **PRESIDING COMMISSIONER ST. JULIEN:** P-R-
    17   A-T-E-R in Oregon. And they they're friends of
    18   yours. They know about the crime and they
    19   understand the punishment. They say, however, I
    20   also know that it as never Paul's intention to
    21   hurt anyone like just take a life. Paul's never
    22   complained about being in prison nor has he ever
    23   given (indiscernible) family. And they recant
    24   your accomplishments while incarcerated
    25   (indiscernible) to make yourself a better
    26   person. And they say Paul has -- does have the
    27   support of his family, and though not related,

26

1    Phil and I fell him to be a member of our family

2    too.   We are willing to help in any way, should

3    he need -- that he needs to ensure Paul is

4    transitioned back into society.   Okay.

5    And then Amy Lynne Baldwin in Seattle,

6    Washington, and she is your niece?

7              INMATE CLEVELAND:   Yes.

8              PRESIDING COMMISSIONER ST. JULIEN:   Okay.

9    And she again says that she's aware of the crime

10   and the seriousness of it.   She says the remorse

11   he feels will be lifelong whether he is in

12   prison or in society.   I believe that if you

13   grant Paul, you're making the right decision.

14   (indiscernible) here, and says my husband and I

15   are prepared to offer Paul any support we can.

16   We understand the transition from incarceration

17   could and quite possibly will be emotionally

18   exhausting, and we are willing to help him in

19   any way possible.   We can offer financial

20   support of up to $500 monthly.   That's very

21   generous.

22             INMATE CLEVELAND:   Oh, yes, they're very

23   generous.

24             PRESIDING COMMISSIONER ST. JULIEN:

25   Should he choose to reside in Seattle, he is

26   welcome to stay in our home for as long as

27   necessary.   Paul's an excellent mechanic and

1 (indiscernible) put his abilities to use right

2 away to help fund his schooling.  Okay.

3 And Martha Sunderland, and another sister, and

4 she says there's no question on Paul's part or

5 that of the members of his family of the

6 seriousness of the crime for which time he's

7 spent more than 20 years.  This is a tragedy for

8 everyone.  Paul's never denied responsibility or

9 the appropriateness of his sentence.  However,

10 he's not the same person now.  As a boy, his

11 actions so much grief in the past.  She says in

12 my visits with Paul, (indiscernible) amply

13 opportunity to observe the changes in him.  He

14 is a responsible caring man.  Okay.  And she

15 says he is welcome to stay in my home and I plan

16 to help him pursue additional education to

17 improve his employment options.  I know that he

18 and I can do much together to ease his

19 transition to life outside of prison when he is

20 released.  Okay.

21 And another niece, Beverly Patterson, she also

22 lives in Vancouver.  She says that

23 (indiscernible) prison, she's kept in touch with

24 you, letters.  She says I'm a government

25 employee, a home owner and the mother of four.

26 I'm prepared to give any support to Paul

27 (indiscernible) possible to help him get on his

1    feet.   My uncle and I share a lot of common
2    interests especially computers, and I'm aware he
3    intends to attend a trade school to sharpen
4    (indiscernible) computer skills.   I would do
5    anything possible to (indiscernible) doing this.
6    And she goes on to state that another reason is
7    that your mother would really like to be able to
8    see you again.
9    And then another niece, Theresa, Theresa Jackson
10   in Vancouver.   And again, she says that she was
11   very young when you came to prison, however, you
12   talk on the phone and she says he became my
13   confidant, my chief confidant in my teenage
14   years, always dispensing advise without
15   preaching.   The advice was good and surprisingly
16   unbiased, always pointing out the right things
17   to do in a way a teenager can accept.   I'm no
18   longer a teenager and still seek his advice.
19   I'm amazed at how fair minded any person could
20   be after spending 22 years in a correctional
21   facility.   Okay.
22   And then Mary Jackson, she is your sister.   And
23   she says that I've been sitting here a while
24   trying to decide what to say, and to some people
25   who have heard it all before.   That they hold
26   the keys to my brother's freedom in their hands.
27   I don't know (indiscernible), it's been 22

1   years.  I'm not trying to say Paul did not

2   deserve the life he ended up with.  He made

3   those choices a long time ago.  But he's a

4   different man now and how he changed for the

5   better is beyond me.  He has become a patient,

6   tolerant, wise, intelligent person.  In

7   considering his surroundings for the last 22

8   years, I think that is quite an accomplishment.

9   Then she says, however, that's not his only

10  function and she recounts your work here, which

11  we'll elaborate on a little later.  She's says

12  I've not been able to see Paul in many years.

13  I'm disabled and I do not well with the travel

14  and visiting room.  My little brother has

15  evolved into someone I can confide in and seek

16  help and comfort in dealing with my precarious

17  health.  And unfortunately, the phone calls are

18  only 15 minutes and quite expensive.  Paul

19  always has a home with me.  If he should need

20  more the minimal amount care I need now -- that

21  is, if I should need more then the minimal

22  amount of care I need now, I couldn't think of

23  anyone who would be more willing to help,

24  whether it be little things or more involved,

25  where I would need him to do the necessary day-

26  to-day things it's getting more difficult to do.

27  So, would you be willing to -- if your sister

30

1    needed --

2        **INMATE CLEVELAND:** Oh, without a doubt,

3    whatever she needed.

4        **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

5    And then Roxana Julliette, and that's two L's

6    and two T's, and apparently she was your arts

7    and corrections teacher at Mule Creek.

8        **INMATE CLEVELAND:** Correct.

9        **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

10   She says I believe in his willingness to work

11   hard at anything he tries.  His steadfast

12   resolve to be the best he could be and his

13   desire to be an asset to the community.  Paul

14   always took the initiative to make the new

15   members feel welcome and you have a great

16   determination and self-discipline to better

17   yourself.

18   And this Vivianna, is it ARELLANO?

19       **INMATE CLEVELAND:** Yes.

20       **PRESIDING COMMISSIONER ST. JULIEN:** A-R-

21   E-L-L-A-N-O in Citrus Heights, California.

22   She's a niece as well.  And she says that you

23   knows -- well, you have all kind of offers of

24   help.  My eyes just went to this, I can offer

25   financial support of up to $600 a month and even

26   provide a car he could use.

27       **INMATE CLEVELAND:** That's very generous.

31

1   **PRESIDING COMMISSIONER ST. JULIEN:**   I
2   guess so.
3       **INMATE CLEVELAND:**   And actually Vivienne
4   is not a blood niece of mine, but she calls me
5   her uncle.  I've known her since she was a
6   little girl.
7       **PRESIDING COMMISSIONER ST. JULIEN:**   Okay.
8   A very generous -- okay, she says additionally,
9   I can offer Paul clothing, assistance to buy
10  tools.  He was an excellent mechanic prior to
11  his arrest (indiscernible) large family and I
12  know everyone is willing to help in every way
13  they can.  And then there's some chronos that
14  I'll (indiscernible)
15  Is there anything else in here about parole
16  plans?
17      **INMATE CLEVELAND:**   I have written letters
18  -- before the Board had told me to make sure I
19  had plans for like Southern California, in case
20  I was required to go there.  I received letters
21  from Delancy Street and both in the Bay Area and
22  in Southern California.  I have -- also I have
23  listings of community resources in several
24  different counties that I've gotten here.  That
25  letter from the, I believe -- I don't remember,
26  it was a State agency, I can't recall which one
27  it is.  It said they will supply whatever is

32

1   necessary for me to be successful on parole.

2          **PRESIDING COMMISSIONER ST. JULIEN:**   Yeah,

3   I think it's -- yeah, it's (indiscernible)

4   Community Services.

5          **INMATE CLEVELAND:**   Yeah, and the list of

6   the AA and NA contacts in the area where my

7   sister lives in Crockett.

8          **PRESIDING COMMISSIONER ST. JULIEN:**   Okay.

9   So, how do you feel about this crime today?

10          **INMATE CLEVELAND:**   About the crime you

11   say?   Oh, it's horrible and I have a hard time

12   -- when I look in the mirror, although I'm aware

13   of what I did, I have a hard time seeing myself

14   having done that.   Of course, it was never my

15   intention.   The day that I set out and I did

16   this robbery, I saw the woman in the store and

17   the robbery, and she ran away, I thought that

18   would be it.   I never thought there would be

19   anybody else there.   I never thought I would use

20   the gun.   Yes, it was loaded and yes, I was

21   military trained.   I didn't think it would

22   become necessary to use it.   It's 23 years --

23   almost 23 years later, it's like that pebble

24   that dropped in a pond, the ripples keep going.

25   People's lives are still being affected to this

26   day.   I never once in my ignorance, considered

27   that would happen.   It's a horrible thing to

33

1   live with.  It's just something that will never
2   go away.  I hear about things that keep
3   happening on the news now, and I look at these
4   guys that do these crimes on the news and I'm
5   disgusted with them, and then I have to get up
6   and look in the mirror over the sink, and I'm
7   that guy.  I'm the same guy that's on the news.
8   I get disgusted with myself.  I have to forgive
9   myself, cause if I don't, I can't move on, but
10  it won't ever go away.

11          **PRESIDING COMMISSIONER ST. JULIEN:**  So
12  how do you think you would be able to function
13  in society?

14          **INMATE CLEVELAND:**  I think, given a
15  period of transition, cause I don't know what
16  the decompression would be like to get out
17  there, but I'm a much more tolerate and patient,
18  forgiving person now than I was.  Back then I
19  was short, you know, I'd be short with people
20  and moving about my business.  Now, I enjoy the
21  company of people more, which surprises me in
22  this environment, but I can be a much better
23  person that I was.  And I don't know if it's
24  just (indiscernible) or maturity or I've
25  attended a lot of these self-help groups, and
26  I'm sure that's helped.  I think I'm so much
27  better now than I was then that I don't

1    understand what I was then.  How I could have
2    been that way.

3           **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
4    Then do you understand and can you -- if you do
5    understand, can you express the reasons.  I
6    mean, I know you were broke and you needed money
7    and all that, but and you didn't have much just
8    -- much regard for others, but what do you think
9    was in you that allowed you to say, okay, I need
10   rent money, I need whatever it was $100 bucks.
11   I need money, and I'm not having any luck
12   getting it on my own, so, number one, I'm going
13   to take it, and number two, I'm going to take a
14   loaded gun with me, and then actually getting in
15   that situation and being able to pull the
16   trigger?  What do you think?'

17          **INMATE CLEVELAND:**  It was just -- I
18   believe a part of me was the desperation that I
19   felt from trying to stay a head of the bill
20   collectors and everything like that.  It was an
21   ignorance on my part thinking that I could go
22   ahead and do this and get away with it and
23   nobody would be hurt.  And that was my primary
24   thought in my mind, nobody was going to be hurt
25   from this, so hell no, this is a bad thing to
26   do, you know, everybody's going to be all right.
27   I had no idea it was going to turn into what it

35

1   did.

2       **PRESIDING COMMISSIONER ST. JULIEN:** And

3   then often times, and perhaps again this might

4   and hopefully it will be how you thought then,

5   that some people think well, gosh, you know

6   what, if I commit this crime, or a property

7   crime, I steal somebody's car or break into the

8   car for stereo or break into somebody's house,

9   you know, and get an object. Get something that

10  is worth something material, monetary, well, no

11  harm, no foul. You know, it's just a property

12  crime.

13      **INMATE CLEVELAND:** That was hope it was

14  going to be like that.

15      **PRESIDING COMMISSIONER ST. JULIEN:** So,

16  do you see a distinction now between property

17  crimes and violent crimes?

18      **INMATE CLEVELAND:** Well, there's very

19  little distinction because what you do, either a

20  property crime or a violent crime, is going to

21  hurt somebody. Whether you go take their stereo

22  or point a gun at them and taken their money,

23  they're still going to be equally affected, and

24  to be honest with you, I should have known.

25  I've been victimized also. I had things stolen

26  from me and probably like most people have and

27  the anger I felt when it happened was, you know,

36

1    I was livid.  And somehow I managed to

2    rationalize this in my mind that going to do

3    this, well, he has insurance.  It'll be all

4    right.  Unfortunately, I was -- I couldn't have

5    been more wrong.

6          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

7    I think I've covered everything.  Commissioner

8    Mejia (indiscernible)

9          **DEPUTY COMMISSIONER MEJIA:**  Mr.

10   Cleveland, I'll be covering your institutional

11   adjustment in this portion of this Hearing since

12   your last Board appearance.  Your last Board

13   appearance was in August of 2002 wherein you

14   received a three-year denial and recommendations

15   were for you to become disciplinary free, become

16   and remain disciplinary free, upgrade

17   vocationally and educationally, participate in

18   self-help therapy, plus the level is Medium A,

19   classification score is 19.  Your current work

20   assignment is (indiscernible) clerk with above-

21   average to exceptional work report.  And you

22   have a GED and a 12.9 GPF.  In 2000, in late

23   2000, you completed the (indiscernible) and

24   self-help.  When did you start going to AA?

25         **INMATE CLEVELAND:**  I started it in Mule

26   Creek in approximately, I believe it was '99.  I

27   had gone earlier to that.  I don't have any

37

1  documentation for it but I also didn't attend on

2  a regular basis.

3          **DEPUTY COMMISSIONER MEJIA:**

4  x(indiscernible) about 2000?

5          **INMATE CLEVELAND:**  That was probably my

6  earliest, yeah.

7          **DEPUTY COMMISSIONER MEJIA:**  And been down

8  since '85?

9          **INMATE CLEVELAND:**  I actually was

10  arrested in '83.

11          **DEPUTY COMMISSIONER MEJIA:**  But you were

12  at CDC since '85?

13          **INMATE CLEVELAND:**  Correct.

14          **DEPUTY COMMISSIONER MEJIA:**  Why did it

15  take you a long time to report for AA or NA or

16  do something for substance abuse?

17          **INMATE CLEVELAND:**  I never really felt

18  that I had a substance problem, although I did

19  experiment a lot, you know, in my earlier years.

20  I never really felt I had much of a problem with

21  -- I don't have a problem to this day with drug

22  abuse.

23          **DEPUTY COMMISSIONER MEJIA:**  Well, I been

24  looking at your psych reports, there was some

25  discrepancies here wherein you told that you had

26  been using -- why did you tell them you were

27  using heroin.  At the day of the time of your

38

1    commitment, you were using heroin also?

2        **INMATE CLEVELAND:**  I told -- that was

3    taken from the probation report.  And the time I

4    was facing the special circumstances and death

5    penalty, and the guys in the jail told me that

6    if I attempted to use a diminish capacity

7    defense that I probably wouldn't be executed for

8    the crime.  So, I went with that

9    (indiscernible).  In fact, they didn't even have

10   that defense any more.

11       **DEPUTY COMMISSIONER MEJIA:**  But were you

12   using heroin the day of the crime?

13       **INMATE CLEVELAND:**  No.

14       **DEPUTY COMMISSIONER MEJIA:**  Let me told

15   you what you told -- I been looking at your

16   psych report here.

17       **ATTORNEY SPOWART:**  Commissioner, are you

18   reading the latest psych report?

19       **DEPUTY COMMISSIONER MEJIA:**  Yeah.

20   (indiscernible) this was reference in report,

21   the psych -- the last psych reports, he said

22   that, I know he said he didn't want to face the

23   death penalty -- wanting to appear as a narcotic

24   addict, however, he was not addicted to heroin

25   at the time of the commitment offense.  In fact,

26   he stated (indiscernible) and makes him very

27   sick.  The inmate stated (indiscernible) medical

39

1    file.  I see he's using (indiscernible) which

2    makes him very ill.  And therefore, and the

3    doctor, (indiscernible) heroin.  So, that it

4    makes that you were addicted -- that you used

5    heroin during the time of the crime

6    (indiscernible)

7        INMATE CLEVELAND:  That is false, sir.  I

8    had tried heroin once in my life and that's

9    where I have learned that I have the allergy,

10   although I didn't know I had an allergy at the

11   time.

12       DEPUTY COMMISSIONER MEJIA:  Did you have

13   problems with marijuana?

14       INMATE CLEVELAND:  I had smoked

15   marijuana, yes.

16       DEPUTY COMMISSIONER MEJIA:  Since 1991,

17   they have you as marijuana defendant, that's the

18   diagnosis.

19       INMATE CLEVELAND:  Yeah, I was diagnosed

20   by one of the psychiatrists.

21       DEPUTY COMMISSIONER MEJIA:  Since 1991,

22   so you've got -- any other self-help or group

23   that you have attended or therapy?

24       INMATE CLEVELAND:  I've attended, I

25   believe it's in the folder, the House is the

26   Healing, which deals with anger management,

27   stress related things.  Also another Anger

 1   Control therapy class.

 2        **DEPUTY COMMISSIONER MEJIA:**  And you have

 3   a (indiscernible) therapy group in 1995?

 4        **INMATE CLEVELAND:**  Correct.

 5        **DEPUTY COMMISSIONER MEJIA:**  Anything

 6   else?

 7        **INMATE CLEVELAND:**  Not, nope.

 8        **DEPUTY COMMISSIONER MEJIA:**

 9   (indiscernible) therapy in 1995 and that House

10   of Healing?

11        **INMATE CLEVELAND:**  House of Healing, yes.

12        **DEPUTY COMMISSIONER MEJIA:**  2001.  (tape

13   ends)

14                  (Off the Record)

15   [Tape turned over - some dialogue is lost]

16        **DEPUTY COMMISSIONER MEJIA:**  -- and I see

17   that you have been doing three-month courses?

18        **INMATE CLEVELAND:**  Yes.

19        **DEPUTY COMMISSIONER MEJIA:**  The last one

20   I have is 2004 (indiscernible)

21        **INMATE CLEVELAND:**  At that point, they

22   went to a Hearing 00

23        **DEPUTY COMMISSIONER MEJIA:**  This was the

24   one, February 2005.

25        **INMATE CLEVELAND:**  Oh, that's correct.

26   They went to -- at that time, I went to the

27   internet-based course.  We can't take them any

41

1    more.

2        **DEPUTY COMMISSIONER MEJIA:**  And you have

3    laudatory chrono from the chaplain for being a

4    good clerk.

5        **INMATE CLEVELAND:**  (indiscernible)

6        **DEPUTY COMMISSIONER MEJIA:**  Yeah,

7    (indiscernible)

8        **INMATE CLEVELAND:**  (indiscernible)

9        **DEPUTY COMMISSIONER MEJIA:**  A new chrono

10   one (indiscernible) the last being December 30,

11   2005, the most recent one?

12       **INMATE CLEVELAND:**  Yes.  The new chronos

13   haven't come out yet.

14       **DEPUTY COMMISSIONER MEJIA:**  Oh, they

15   haven't come, but you still attend there, right?

16       **INMATE CLEVELAND:**  Yes.

17       **DEPUTY COMMISSIONER MEJIA:**  And so you

18   are happily involved now in AA, right?

19       **INMATE CLEVELAND:**  Yes.

20       **DEPUTY COMMISSIONER MEJIA:**  And the last

21   -- other self-help that you had was '95 therapy

22   for lifers, then the 2001 healing?

23       **INMATE CLEVELAND:**  Yes.

24       **DEPUTY COMMISSIONER MEJIA:**  And what's

25   the other one?

26       **INMATE CLEVELAND:**  That's all.

27       **DEPUTY COMMISSIONER MEJIA:**  Just two.

42

1    Okay, and then you enrolled in AA.  You have

2    suffered fifteen 115s, the last one being from

3    the period of 1985 since your inception, and

4    1999 being the last for (indiscernible).  Why so

5    many?

6              INMATE CLEVELAND:  I had -- from the

7    period -- the ones I received from incarceration

8    until approximately 1994 is one for

9    participation in a work strike.  Following that,

10   I believe there was one that I didn't intend to

11   get.  Other ones I foolishly attempted to keep

12   my (indiscernible) level at Level 3 as I spent

13   19 months in the dorms in Solano.  It was

14   miserable living, and I foolishly attempted to

15   keep my point level Level 3 so I could remain in

16   cell housing.  That's why you notice that

17   they're primarily for smoking violations.

18             DEPUTY COMMISSIONER MEJIA:  And your

19   Initial Parole Consideration Hearing was in

20   1992, huh?

21             INMATE CLEVELAND:  No my Initial was

22   (indiscernible)

23             DEPUTY COMMISSIONER MEJIA:  What year was

24   that?

25             INMATE CLEVELAND:  That was 2000.

26             DEPUTY COMMISSIONER MEJIA:  2000, so

27   that's one year after you went to

43

1  (indiscernible) your Initial Parole

2  Consideration Hearing.

3          INMATE CLEVELAND:  One year prior to my

4  Initial Hearing.

5          DEPUTY COMMISSIONER MEJIA:  The last one

6  in (indiscernible) and one in 2000.  You have

7  nine 128s from 1986 to 2001.

8          INMATE CLEVELAND:  I'd like to point out

9  that although I do have the rules violations, I

10  have no rules violations for anything that would

11  be considered violent or drug use or anything

12  like that.

13          PRESIDING COMMISSIONER ST. JULIEN:  Well

14  -- excuse me, can I -- excuse me.

15          DEPUTY COMMISSIONER MEJIA:  Yeah.

16          PRESIDING COMMISSIONER ST. JULIEN:

17  That's the distinction we were talking about,

18  you know, property versus non-property.  This

19  is, and I know you've been (indiscernible) on it

20  before --

21          DEPUTY COMMISSIONER MEJIA:  Yes, I have.

22          INMATE CLEVELAND:  But, you know, you

23  wanting to stick the knife in your back.  Now

24  why are you getting --

25          INMATE CLEVELAND:  Unfortunately, I

26  already have stuck the knife in my back.

27          PRESIDING COMMISSIONER ST. JULIEN:  I

44

1  mean, do you realize, maybe you didn't realize

2  it then, I mean, if the Board is unforgiving

3  about one thing, it is 115s.

4      INMATE CLEVELAND:  I realize that.  I

5  didn't --

6      PRESIDING COMMISSIONER ST. JULIEN:  And I

7  don't think I should -- and I read you wanted to

8  be -- it's like the heroin thing, you know,

9  it's --

10      INMATE CLEVELAND:  I don't understand.

11      PRESIDING COMMISSIONER ST. JULIEN:  Don't

12  try to outsmart the system.  Don't try to make

13  to your benefit because you're just --

14      INMATE CLEVELAND:  I don't understand

15  what you mean about the heroin thing.

16      PRESIDING COMMISSIONER ST. JULIEN:  Well,

17  saying that you were addicted to heroin so that

18  you could get an easier -- I don't know, what

19  was that?

20      ATTORNEY SPOWART:  So, he wouldn't get

21  the death penalty.

22      PRESIDING COMMISSIONER ST. JULIEN:  Yeah,

23  yeah.

24      INMATE CLEVELAND:  That is not, that was

25  a desperation true.

26      PRESIDING COMMISSIONER ST. JULIEN:  I can

27  understand that, but -- but these things haunt

45

1  you.

2      **INMATE CLEVELAND:**  Yes, and they have,

3  every time I've appeared.

4      **PRESIDING COMMISSIONER ST. JULIEN:**  And

5  then you got the -- cause I'm looking at you,

6  like I said (indiscernible) And I know you've

7  been told this before.  I'm looking at you as

8  somebody who, you know, you look real good, and

9  then you say all this other stuff and it's like,

10  what the heck are you doing to yourself.

11      **INMATE CLEVELAND:**  You're probably

12  reading from the last Hearing that what I stated

13  at I'm a fairly intelligent person, and the

14  Board member replied yes.  Too smart for your

15  own good.

16      **PRESIDING COMMISSIONER ST. JULIEN:**  Yeah.

17  Well, you need to talk to some of --

18      **INMATE CLEVELAND:**  I say that now.  At

19  the time -- and again, I thought, well, I'm

20  getting these petty little 115s and I'm still

21  living in an environment that's all right with

22  me.  Not only realizing that, you know, they'd

23  be taking those serious --

24      **PRESIDING COMMISSIONER ST. JULIEN:**

25  They're going to kill you.  And I tell you,

26  they're going to haunt you -- it's a situation

27  that unfortunately for you, it's going to follow

46

1   you.

2           **INMATE CLEVELAND:**  I'm aware of that.

3           **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

4   But then the good think is that you haven't had

5   any since -- Okay, I'm sorry, Commissioner.  I

6   just had to chime in there.

7           **DEPUTY COMMISSIONER MEJIA:**  Well, I was

8   going to say the same thing is that I was going

9   to make as assessment that he's very

10  manipulative, at least from what I saw on those

11  two occasions there.  The 115s and the

12  (indiscernible) death penalty.  So, I don't know

13  which one to believe right now and what is --

14  So, anyway, the last psych report indicated he

15  has a diagnostic impression, Access I of no

16  contributory clinical disorder, Access II no

17  contributory personality disorder, no

18  contributory physical disorder, lifetime

19  incarceration, Access V a GAF of 90.  Assessment

20  of dangerousness, indicate that the inmate's

21  (indiscernible) violence potential within a

22  controlled setting and institution is definitely

23  below average in comparison to other inmates.

24  If released to the community, he (indiscernible)

25  assessment of dangerousness is also seen

26  (indiscernible) below average in comparison to

27  other inmates.  In my previous evaluation, I

47

1    stated that this potential, this is Dr.

2    Macomber, M-A-C-O-M-B as in boy E-R, dated May

3    12, 2003.  He said -- he stated that his

4    potential for dangerous behavior, mental

5    behavior, was no greater than the average

6    individual living in society.  That statement is

7    still valid.

8    At this point in his life, there are no

9    significant risk factors which could be a pre-

10   cursor to violence for the inmate.  Inmate

11   Cleveland (indiscernible) still in computer

12   programming, computer operation, computer

13   problem solving.  As a result, he's quite

14   employable in (indiscernible).  His

15   (indiscernible) for mental or emotional problems

16   to interfere with them being granted a parole

17   date.  There's no need for further psychotherapy

18   or counseling.  By the way, we have in File here

19   BPT 214 (indiscernible) military service.

20          **INMATE CLEVELAND:**  (indiscernible)

21          **DEPUTY COMMISSIONER MEJIA:**  Would you be

22   -- have it with you?

23          **INMATE CLEVELAND:**  No.

24          **DEPUTY COMMISSIONER MEJIA:**  Is there some

25   way that you can --

26          **INMATE CLEVELAND:**  I can send for it.

27          **DEPUTY COMMISSIONER MEJIA:**  If you can,

48

1    just put it in the File.  Do you have any

2    additions, counsel, with regards to his

3    programs?  Did I miss anything on your

4    (indiscernible)

5          **ATTORNEY SPOWART:**  The laudatory chronos.

6          **INMATE CLEVELAND:**  Laudatory chronos,

7    donations to charitable events.

8          **DEPUTY COMMISSIONER MEJIA:**  That's the

9    (indiscernible) 2005 (indiscernible) teddy bear

10   drive?

11         **INMATE CLEVELAND:**  Yeah.

12         [both talking at the same time -

13   indiscernible]

14         **DEPUTY COMMISSIONER MEJIA:**  2004, 2000

15   and --

16         **INMATE CLEVELAND:**  I have numerous

17   laudatory chronos since the last --

18         **DEPUTY COMMISSIONER MEJIA:**  I will try to

19   get it to between 2002 and today.

20         **INMATE CLEVELAND:**  And again, numerous

21   chronos in those periods as well.

22         **DEPUTY COMMISSIONER MEJIA:**  Like what?

23   Other than the (indiscernible) what else?  Your

24   supervisor?

25         **INMATE CLEVELAND:**  Yeah, my supervisors,

26   various supervisors, because I've been given job

27   assignments that they just bring to me.

49

1          **DEPUTY COMMISSIONER MEJIA:**

2    (indiscernible)   What's the most recent?   You

3    have anything after 2002?   The chaplain wrote

4    you one.

5          **INMATE CLEVELAND:**   There's several pages.

6    There's a laudatory memorandum written by a

7    lieutenant.

8          **DEPUTY COMMISSIONER MEJIA:**

9    (indiscernible) .

10          **INMATE CLEVELAND:**   And chronos signed by

11    the Warden a couple of times.

12          **DEPUTY COMMISSIONER MEJIA:**   What date was

13    that?

14          **INMATE CLEVELAND:**   I would have to look

15    to tell you.   They're in there, yes.

16          **DEPUTY COMMISSIONER MEJIA:**

17    (indiscernible) for your record.   What year is

18    that?

19          **INMATE CLEVELAND:**   Be in 2005.   I had to

20    assist in redesigning all the standard forms for

21    the institution.   I also -- laudatory chronos

22    from CC-II now captain Cerelli on several

23    special projects that he brought me.

24          **DEPUTY COMMISSIONER MEJIA:**   What date is

25    that?

26          **INMATE CLEVELAND:**   Those would be in 2005

27    also, I believe or late 2004.

50

1          **DEPUTY COMMISSIONER MEJIA:** Anything
2   else?
3          **INMATE CLEVELAND:** The memorandum from
4   Lieutenant Tucker. Laudatory chronos from
5   Sergeant Skinner, Officer (indiscernible),
6   there's numerous, I can't --
7          **DEPUTY COMMISSIONER MEJIA:** Yeah,
8   (indiscernible) I just have a (indiscernible)
9          **INMATE CLEVELAND:** I'm a good worker.
10         **DEPUTY COMMISSIONER MEJIA:** Very good.
11  Very (indiscernible) is what he said you are.
12  Anything else? (indiscernible)
13         **ATTORNEY SPOWART:** Turn this over to the
14  Commissioner?
15         **INMATE CLEVELAND:** I was just checking,
16  I'm sorry.
17         **DEPUTY COMMISSIONER MEJIA:** Commissioner,
18  let me turn this back to you then.
19         **PRESIDING COMMISSIONER ST. JULIEN:** Thank
20  you. Mr. Jacobs, do you have any questions for
21  Mr. Cleveland?
22         **DEPUTY DISTRICT ATTORNEY JACOBS:** Yeah,
23  just a couple. I'd like to know what span of
24  time the prisoner was in Mule Creek? From what
25  date to what date?
26         .INMATE CLEVELAND: I believe it was in
27  late '89 till 2001, I believe. I'm not sure

1    though.  I'm sorry, late '99.

2         **DEPUTY DISTRICT ATTORNEY JACOBS:**  I have

3    dates of January 21, 1997 to May 24, 2001.

4    Would the prisoner say that's about right?

5         **INMATE CLEVELAND:**  I believe that's

6    correct, yes.

7         **DEPUTY DISTRICT ATTORNEY JACOBS:**  How

8    does the prisoner then account for the thirteen

9    115s, 128s, that he received before arriving at

10   Mule Creek and the problem with the Mule Creek

11   dormitory?

12        **INMATE CLEVELAND:**  Not all of my rules

13   violations were part of an attempt to stay out

14   of the dormitory.  The ones that I received

15   early on were conflicts I had with staff on

16   occasion or a failure to report to a job

17   assignment.  The ones I had, the smoking

18   violations and things like that, are definitely

19   my attempt to stay out of the dormitory.  I, you

20   know, I received a violation as I actually did

21   violate the rules on several occasions.  And I

22   think you'll find that there's one for out of

23   bounds.  I was sitting in my cell at 10:00 at

24   night on my phone.  My cellie had switched with

25   somebody and I had got written up included in

26   that somehow.  I appealed it.  I lost, I still

27   don't know hot it stayed but there are violation

52

1    that I, you know, I did do something wrong, like

2    out of bounds or something to that effect.    I

3    can't justify them.

4        **DEPUTY DISTRICT ATTORNEY JACOBS:**    No

5    further questions.

6        **PRESIDING COMMISSIONER ST. JULIEN:**    Mr.

7    Spowart?

8        **ATTORNEY SPOWART:**    (indiscernible)

9        **PRESIDING COMMISSIONER ST. JULIEN:**    Do

10   you have any further questions Commissioner?

11       **DEPUTY COMMISSIONER MEJIA:**    No other

12   questions.

13       **PRESIDING COMMISSIONER ST. JULIEN:**    Okay.

14   Mr. Jacobs, do you have a closing?  .

15       **DEPUTY DISTRICT ATTORNEY JACOBS:**    Yes, I

16   do.    Manipulative was mentioned in describing

17   the prisoner.    It's funny, because that's the

18   first word I wrote down when taking notes.    He

19   manipulated his 115s to avoid placement, and may

20   or may not have manipulated his total defense in

21   trial to avoid the death penalty.    If, in fact,

22   he did fake his heroin addiction to avoid the

23   death penalty, and I might mention that the

24   death penalty would not have been even a serious

25   consideration till it went through to the death

26   penalty board, which wouldn't have happened

27   until after his preliminary hearing, and he

53

```
 1   would have known whether he was facing the death
 2   penalty.  Not(indiscernible) was.  If that's
 3   true, he scammed the DA's Office.  He scammed
 4   the Court.  And if it's not true, then he's
 5   scamming the Board.  One way or another, he is
 6   not leveling with us.
 7   Now, if, in fact, he faked his heroin addiction,
 8   then I see no reason for showing sympathy
 9   towards the prisoner at all because if, in fact,
10   he'd been convicted of special circumstances,
11   and he had not been put to death, and I believe
12   based on these facts, he probably would not have
13   gotten the death penalty, he wouldn't be here,
14   because he'd be serving life without possibility
15   of parole and we'd never see him on the streets
16   again.  However, he managed to avoid the special
17   circumstances that were, in fact, charged
18   against him, and is now saying, no that's not
19   true.  I really wasn't an addict, and I'm saying
20   his statements aren't trustworthy.
21   He's not done anything really as far as self-
22   help, AA goes, until just very recently.
23   Assuming that he was addicted to heroin, he
24   needs AA.  Assuming he was not addicted to
25   heroin, I just don't know if there's any self-
26   help classes that work on people who don't tell
27   the truth.  In any event, at least from what has
```

54

1    occurred over the years he's been here, I do not

2    believe that his statement are reliable enough

3    position for him to be eligible for parole.  I

4    think he's going to have to put the proof of the

5    pudding by his actions, not his words because

6    his words just don't seem to appear to mean too

7    much.  And since he's only just barely started

8    programming and is kind of skated through his

9    programming up until this time, I think he needs

10   a few more years before we can start considering

11   whether he's eligible for parole.

12   He seems to be of relatively good intelligence.

13   And he hasn't tried upgrading his academics at

14   all.  I've done cases where people have gotten

15   college degrees in prison and I see nothing of

16   that nature.  It appears that the inmate is

17   doing exactly what he feels like doing and has

18   been since the day he arrived.  He takes

19   programs that interest him.  With things that

20   don't interest him, he doesn't want to do.  And

21   unfortunately, he's not the tail wagging dog.

22   He has got to conform to what the Board wants of

23   him, and he -- I don't believe he's doing so,

24   and I think that he not only needs them now, but

25   I think it should be several years.

26          PRESIDING COMMISSIONER ST. JULIEN:  Okay,

27   thank you.  Mr. Spowart?

55

1        **ATTORNEY SPOWART:**   Yeah, a couple things
2   here to go over.  My client stipulates to
3   juvenile probation period for (indiscernible).
4   At the time of his arrest in 1983, my client
5   accepted full responsibility for Mr. Lee's
6   death.  His account of the (indiscernible) law
7   enforcement officials and he stipulates to the
8   count document and life prisoner evaluation for
9   2005.  Now, the DA makes a point of saying well,
10  he manipulates.  He stipulated to everything.
11  He said -- including the police reports.  He's
12  never denied it.  His part in that role is in
13  the record.  He doesn't deny it, he has
14  stipulated it, takes full and complete
15  responsibility.  As far as I know, going back
16  through the record, I've never seen anything
17  that contradicts that.

18  My client has fulfilled the recommendations
19  given by the Board in his last two appearances.
20  This includes remaining disciplinary free,
21  attending self-help, completing vocational
22  training and working within the field of the
23  training, continuing education and obtaining
24  viable parole plans.  He obtained a favorable
25  updated psych evaluation following his last
26  Hearing.  The evaluation remains favorable for
27  parole.

56

1   Although my client has several disciplinary
2   infractions, none of the disciplinary
3   classification level -- F, the lowest level of
4   disciplinary report.  My client has had no
5   infractions for over six years.  The Life
6   Prisoner Evaluation report documents four
7   laudatory chrono reports in the time since his
8   last Board Hearing.  He has, in fact, several of
9   these.  He's, in fact, received over 21 for a
10  variety of reasons, including his job,
11  (indiscernible) silent participation in
12  charitable events, willingness to assist staff
13  and inmates.  Special assignments and
14  participation in self-help, excellent attendance
15  CB Tucker offered a laudatory memorandum, in
16  here own words, he's in no way a common
17  practice, meaning that she doesn't do this
18  commonly.  And three of the chronological
19  reports were signed by the Warden of the
20  institution.
21  In light of these facts, my client asks the
22  Board to set a primary term today regardless of
23  his suitability finding.  My client has several
24  -- multiple letters of support from family and
25  friends, all offering residential, financial and
26  familial support.  He has made realistic parole
27  plans to live with his sister Martha Sutherland

 1  in Crockett, California, with alternative

 2  options, should he be required to return to Los

 3  Angeles County. He has a job offer taking

 4  advantage of his computer skills, including the

 5  offers of assistant to modernizing his skills.

 6  And we provided you with a packet today and the

 7  Commissioner went through the letters in

 8  details, made the notation herself that he has

 9  great support, generous support.

10  (indiscernible) juvenile, where he got six

11  months probation, stable -- not social history,

12  fifth of six children, mother retired

13  (indiscernible). Was in the Army reserves from

14  '75 to '77, and the regular Army in '77,

15  honorably discharged in '80, got his GED prior

16  to going into the Army. Basically, able to

17  remain reasonable stable relationships with

18  others as the definition of -- as taken from

19  Title 15, that sets up these Hearings.

20  Remorse, yes. Psych report and he explains, you

21  know, how he felt. Motivation again, he was

22  very open with you today. Why did he do this?

23  I needed money for (indiscernible). He was 25

24  at the time, he's immature. Obviously, didn't

25  think anybody -- what he did, anybody would get

26  in trouble by -- but a roommate at the time said

27  if I got a gun, the chance I might use it. He

1   didn't think -- his whole idea was, oh, people
2   from TV, I guess, they rob stores all the time
3   and you get away with it and nobody gets hurt.
4   He knows better now for sure.   Adult convictions
5   was the instant offense only.   He's 48, big
6   difference from the age he was -- 25 now.
7        **INMATE CLEVELAND:**   (indiscernible)
8        **ATTORNEY SPOWART:**   Forty-eight now,
9   twenty-three years.   Now, as this -- getting to
10  this manipulative thing.   The psych report -- I
11  was asking about (indiscernible) -- your Initial
12  Hearing you were denied two years, the next
13  time, you were denied three, how come?   That
14  said well, the Commissioner thought I was lying
15  about this being addicted to heroin and not
16  being addicted to heroin.   So, this -- going
17  back to the present psych report (indiscernible)
18  the first page and looking through his medical,
19  and the Commissioner read this, but I want to
20  emphasize.   In looking through his medical file,
21  I see that physicians have documented the fact
22  that he is allergic to opiates, which make him
23  very ill.   Now, he said he'd been using six
24  months prior to this, but he'd been dead.   I
25  asked him about this.   He said the first time,
26  and admitted to the Board he didn't use.   At one
27  time, he says, I had such a bad reaction, my

59

1    throat filled up and he says I had a hard time

2    breathing. That was it. So, he was not

3    addicted. The DA says, he's so knowledgeable,

4    he's assumes he's knowledgeable about the law

5    and all the factors that he wouldn't have been

6    given a death sentence. This guys 25 years old,

7    in jail, and he has a jail-house lawyer tell

8    him, hey man, you facing a death sentence, you

9    better tell them something. The DA says well,

10   it (indiscernible)  They wouldn't have gotten

11   the thing. He didn't know that. He thought he

12   was facing the death sentence so he said

13   something. I don't know (indiscernible). I was

14   trying to put myself in a position and say, wow,

15   I'm facing the death sentence, all of a sudden,

16   somebody's getting my attention here. I gotta

17   to do something. He didn't get the death

18   sentence. But that explains why.

19   Now, in his answers to you today, he was direct,

20   forthright, taking responsibility for

21   everything. He could have told you -- he didn't

22   have to tell you that, well, I got all these

23   things from (indiscernible) cause I wanted to

24   get out of the dorm. None were serious. He was

25   smoking. I told him, just like the Commissioner

26   did, you get 115s as a lifer, you can't afford

27   (indiscernible). This is the death sentence

1    because they will use it against you.  I don't
2    care if they're minor or not, they're going to
3    use it against you.  I've had enough of these
4    Hearing, I know that they'll use it.  And he
5    knows that, now.
6    The last over about six and a half years, he's
7    been doing everything that they told him to do,
8    everything.  Some of these chronos he got are,
9    you know, (indiscernible) exception, signed by
10   the Warden, some signed by the correctional
11   officers, outstanding work reports, and there's
12   one in here, I had a note down here
13   (indiscernible) by Class C Facility Captain
14   about his work, work laudatory chrono signed by
15   Seal, (indiscernible) in his work, honesty,
16   reliability, ability to function under stressful
17   conditions, that is the constraints of getting a
18   job done.  He completed a certificate from FEMA.
19   That very cause of psych reports and Board
20   reports, and both psych reports (indiscernible).
21   So, since his last two Hearings, he'd done
22   everything that you asked him to, remained
23   disciplinary free, been in AA with laudatory
24   chronos, got praises from the correctional
25   officers.  The correctional officers, there are
26   very few of them that write, you can get other
27   people to write, but I've noticed that it's not

61

1   too often that a CO will give laudatory chronos

2   and he has several.

3   So, where are we today?  Not the fact that he

4   committed the crime.  Not the fact that he's

5   sitting in the jail and jail-house lawyers are

6   telling him, man, you got a death penalty coming

7   up.  We're here today.  What do the people think

8   about him now?  Below average here, he's no more

9   dangerous than the average citizen on the

10  street.  I know the Board gets upset when they

11  hear this.  The DA gets upset because he may be

12  no more dangerous than the average person on the

13  street, cause the average person on the street

14  hasn't shot somebody.  Well, that was 20 -- he

15  was 25 then, he's 48 now, and he's learned a

16  lot.  He's taken a lot of courses.  How to

17  function in society, that's the difference,

18  that's why he's not the same danger that he was

19  then.  I'd ask a date (indiscernible) everyone

20  that writes something in here, says he's no

21  danger.  All you can do is say the life crime

22  was a fact (indiscernible).  He understands

23  that.  But since then, he's worked and showed

24  himself capable of returning to society,

25  certainly not an unreasonable risk of danger.

26  The average person on the street is not an

27  unreasonable danger to society.  I'll submit.

62

1          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,
2   thank you.  Mr. Cleveland, do you have anything
3   you'd like to add regarding your parole
4   suitability?

5          **INMATE CLEVELAND:**  Well, I'd like to say
6   that being accused of having scammed the courts
7   or scammed the Board or scammed anybody, the
8   worst I've ever done is attempting to live a
9   live a little easier, scammed myself.  As it's
10  been said, I've admitted my guilt from the first
11  couple of hours since I killed Mr. Lee.  I
12  admitted my guilt.  And especially at the time,
13  the police officer told me that, you know,
14  you're accused of having killed somebody.  I was
15  shocked to ever hear that -- I knew I had shot
16  him, I didn't know he had died and I haven't
17  attempted to scam anybody.
18  Yes, I have been manipulative in trying to live
19  more comfortably, you know, than I had been.  I
20  didn't attempt to harm anybody in this process.
21  I, you know, harmed myself doing it.  It was a
22  stupid thing to do, but I'm not scamming
23  anybody.  I'm not that good, and I don't believe
24  that anybody sitting in this Panel or
25  experienced staff in these institutions are --
26  so, they're going to fall for my brief attempts
27  at doing anything.  You know, all I do is

1   collect a couple of disciplinary reports in

2   order to maintain a custody level, which I

3   shouldn't have done.

4   I think that if you were to set a date today for

5   me, you wouldn't regret it. And you wouldn't

6   hear from me again. The only person to hear

7   from me is the parole officer I report to

8   (indiscernible). I have all the support in

9   place. I have educational opportunities to

10  upgrade my skills and modernize them. I have

11  everything that I need. I don't consider myself

12  any sort of danger to society. I don't even

13  want to think about hurting anybody again. I

14  wouldn't want to put myself in a situation where

15  that possibility might exist. I would be happy

16  if I were granted a date to go sit in my

17  apartment or the house, got to my job, and maybe

18  go to a gym or something and come home. I don't

19  need the lifestyle of running around like I used

20  to do. I'm getting old now, and I'm getting

21  kind of sedate and I would just be happy if you

22  grant me an opportunity to show you that you

23  didn't make a mistake allowing me to become a

24  productive member of society.

25  ///

26  ///

27  ///

64

1          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

2     thank you very much, sir.  We'll recess now for

3     deliberations.

4                    **R E C E S S**

5                      --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1        **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3        **DEPUTY COMMISSIONER MEJIA:** We're back on

4    record for a decision on this Paul Cleveland

5    matter. We're now on record.

6        **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

7    Mr. Cleveland, we are going to deny parole today

8    and I'll read the decision and make some

9    comments. The Panel reviewed all information

10    received from the public and relied on the

11    following circumstances in concluding that the

12    inmate is not yet suitable for parole and would

13    pose an unreasonable risk of danger to society

14    if released from prison.

15    The commitment offense: the commitment offense

16    was carried out in a cruel manner and this is

17    the robbery -- it began as a robbery of a liquor

18    store and this was on May 23, 1983 in Canoga

19    Park. The inmate had a -- was down on his luck,

20    in need of money, so he and a friend decided to

21    rob a liquor store. The liquor store that they

22    chose was a Korean market and the inmate entered

23    the store. He beat the (indiscernible) cashier

24    and he was suddenly (indiscernible). Apparently

25    her husband was also the owner of the store,

26    suddenly ran into the back of the store and told

27    **PAUL CLEVELAND C-99765 DECISION PAGE 1    3/15/06**

1    her husband he was being robbed.  The husband,

2    whose name was Joong Fong Lee, grabbed a two by

3    four, apparently a big piece of wood, and tried

4    to attack Mr. Cleveland.  Mr. Cleveland fired

5    one round from his 38 caliber handgun at Mr.

6    Lee.  Unfortunately, the bullet hit Mr. Lee, hit

7    Mr. Lee in the head and he subsequently died

8    from that gunshot wound.  So, indeed, the motive

9    for this crime was very trivial in relation to

10   the offense, in that it was over monetary

11   (indiscernible).

12   And in terms of a previous record, there's a

13   juvenile probation for a siphoning gas burglary.

14   The inmate, in terms of institutional behavior,

15   has -- we'll say that you've been programming in

16   a limited manner.  Our records really reflect

17   that you started an honest programming since

18   2000, so that's very -- not a long period of

19   time where you've been (indiscernible) to get

20   yourself out of here.

21   The psychological report is favorable.  And this

22   is the psychological report dated May 12, 2003

23   by Dr. Macomber.  Your parole plans are

24   realistic.  You parole plans are good, they're

25   viable residential plans with your sister.  You

26   also have family in the State of Washington if

27   **PAUL CLEVELAND C-99765   DECISION PAGE 2   3/15/06**

1    you're able to make the way up there.  And you
2    have employment plans and you have a
3    (indiscernible) of skills.  There's also been
4    opposition expressed to the 3042 Notices from
5    the District Attorney of Los Angeles County.
6    And we do find that you continue to need self-
7    help in order to face, discuss and understand
8    and copy with stress in a non-destructive
9    manner.  And your gains are recent, and you must
10   be able to demonstrate and ability to maintain
11   these gains over an extended period of time.
12   And we are going to give you a two (sic) year
13   denial.  We find that you have been convicted of
14   murder and it's not reasonable to expect that
15   parole would be granted at a hearing during the
16   next three years.  Again, we're basically
17   keeping you at the same level as before and
18   again, the commitment offense, it was first
19   degree murder, robbery murder and this occurred
20   on May 23, 1983.  The inmate was in need of
21   money.  He decided to rob a market, a liquor
22   store, this was in Canoga Park.  During the
23   robbery, one of the owners of the store tried to
24   attack Mr. Cleveland to -- I guess to stop him
25   from robbing the store, however, unfortunately
26   for him, Mr. Lee was not unsuccessful in
27   **PAUL CLEVELAND C-99765  DECISION PAGE 3  3/15/06**

68

1   stopping the robbery, but he got shot.  The
2   inmate shot Mr. Lee one time.  The wound hit him
3   in the head and Mr. Lee did die from that
4   gunshot wound.
5   And this crime, indeed, was committed in cruel
6   manner and it was -- the reason, the motive was
7   very trivial, again, monetary gain.  And the
8   things that you need to work on and my colleague
9   will make a couple of comments, but I will just
10  say now, that, you know, I was (indiscernible)
11  stated earlier, yours is a hard case.  You got a
12  first degree murder and you've got somebody you
13  had no business being there.  There's no way to
14  predict that you would ever put yourself in that
15  situation, but almost (indiscernible) is what
16  you've done since then.  And you know, getting
17  the 115s (indiscernible) your own understanding,
18  getting the 115s to reduce your custody level,
19  you know, I know why you did it.  I can't even
20  imagine how hard life is in prison, but you
21  can't do stuff like that.  And you can't
22  maintain for years that you had a heroin
23  addiction.  I mean, if you're going to make up a
24  story like that, continue it all the way
25  through.  You don't go to AA or NA or whatever.
26  But, you know, here now we're faced with, well,
27  **PAUL CLEVELAND C-99765   DECISION PAGE 4   3/15/06**

1    what's this guy up to?  You know, is he truly a
2    manipulator and will this man continue -- what's
3    he going to do when he's outside?  And just for
4    your whatever, I did your matrix.  I worked out
5    your term, and unfortunately, you're not close.
6    I don't know if you worked it out before or
7    whatever, but, you know, you get four months of
8    credit for each year that you did not get a 115,
9    okay.  And not that that probably wouldn't even
10   help you that much.  Right now, you're looking
11   at, you know, you've got -- at least eight years
12   away.  So, of course, the Board can set a date
13   in the future, it's not that often, you know,
14   there's not really any purpose in doing it.  At
15   some point in time, it usually gets taken away
16   and it's very, very hard for you to get another
17   one.  So, it's not something that I think
18   anybody is really inclined to do.  But just for
19   you, you know, you've got that murder first.
20   So, anyway Commissioner do you have
21   commendations?

22        **DEPUTY COMMISSIONER MEJIA:**  Yes, Mr.
23   Cleveland until 1994, you have excellent
24   (indiscernible) and everybody else -- the people
25   that you mentioned are (indiscernible).  The
26   acting warden, the CC-II, the officer, and Dr.,
27   **PAUL CLEVELAND C-99765  DECISION PAGE 5  3/15/06**

1    they all spoke good about you.  You're an

2    excellent clerical person here in the

3    institution.  You also have a 12.9 GPL.  It

4    might be also that you (indiscernible) since

5    1999 for 115s, but just like we were talking

6    about, you have -- from 1985, that's -- you've

7    been down 21 years and 1999 was the last 115.

8    You actually start programming in 2000.  So, out

9    of the 21, 15 years was almost like a waste.

10   You just have to continue what you're doing.

11   You got yourself in a hole that you have to

12   climb out -- back out of.  And the only way you

13   can deal with that is show us that you're

14   consistent -- you've been consistent the last

15   six years now, we'll make if five, a little bit

16   over five years.  Continue that, AA, NA, cause

17   despite of -- there's an issue about whether a

18   (indiscernible) yes or no, you're still -- you

19   know that there's still some other issues

20   (indiscernible) that you can benefit from like

21   (indiscernible) cause it can be applied to real

22   life issues.  Right.  I want you to continue

23   that and I want you to continue that good

24   chronos.  Your therapy is minimal.  1995 to 2001

25   is, you know, the -- you have to work harder,

26   okay.  With that, I would say continue what

27   PAUL CLEVELAND C-99765  DECISION PAGE 6  3/15/06

1    you're doing.  You're now on the right track,

2    starting 2000 (indiscernible) you're going to

3    have three more years of clean time and good

4    programming and people, you know, they'll get

5    different respect for you for the next three

6    years.  You continue what you're doing now.

7    You're getting all the good chronos that you get

8    (indiscernible) Okay.

9          **PRESIDING COMMISSIONER ST. JULIEN:**  And

10   do as much programming as you can even a self-

11   study program.

12         **INMATE CLEVELAND:**  Unfortunately,

13   there's, you know, as far as like therapy and

14   things like that, a lot of (indiscernible)

15         **DEPUTY COMMISSIONER MEJIA:**  You're not

16   (indiscernible)

17         **PRESIDING COMMISSIONER ST. JULIEN:**  No,

18   we're not (indiscernible) therapy.  A self-

19   study, you know, self-help kind of means that

20   help yourself so, you can read books, you know,

21   there's something in the library, your family

22   can send you something.  You know, come in here,

23   you have a great portfolio so far, you know,

24   just come in here with double, or you know,

25   whatever you can come in here with.  And like I

26   said, I think it's going to be a different

27   **PAUL CLEVELAND C-99765  DECISION PAGE 7  3/15/06**

72

1    situation cause I calculate, you need -- you

2    have about 81 months.  So you need to come in

3    here, and like I tell everybody, don't give us a

4    reason to tell you no.

5         **DEPUTY COMMISSIONER MEJIA:**  But you're on

6    the right track.

7         **PRESIDING COMMISSIONER ST. JULIEN:**  Yeah,

8    you are.

9         **DEPUTY COMMISSIONER MEJIA:**  You are on

10   the right track.  You just need some more --

11   some more programming to show that you will

12   balance out in your life and (indiscernible) in

13   2003 with the psych -- differences when it comes

14   to substance abuse.  It's like I said

15   (indiscernible) the first one and you still need

16   self-help like you said, read books.  You've

17   very intelligent, you got clerical skills, you

18   can write, you know, you can give us -- when you

19   come in and bring us (indiscernible) books

20   you've read, substance abuse and self-help.  All

21   right.  Good luck, okay.

22   ///

23   ///

24   ///

25   ///

26   ///

27   **PAUL CLEVELAND C-99765  DECISION PAGE 8  3/15/06**

1          PRESIDING COMMISSIONER ST. JULIEN:    Thank

2    you.   We wish you good luck.   The time is five

3    after two (2:05 p.m.).

4                        --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED THREE YEARS

24    THIS DECISION WILL BE FINAL ON: JUL 1 3 2006

25    YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    PAUL CLEVELAND C-99765   DECISION PAGE 9   3/15/06

74

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, P. M. LaCHAPELLE, a duly designated
transcriber, PETERS SHORTHAND REPORTING, do
hereby declare and certify under penalty of
perjury that I have transcribed tape(s) which
total one in number and cover a total of pages
numbered 1 - 73, and which recording was duly
recorded at CORRECTIONAL TRAINING FACILITY,
SOLEDAD, CALIFORNIA, in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING OF PAUL
CLEVELAND, CDC NO. C-99765, ON MARCH 15, 2006,
and that the foregoing pages constitute a true,
complete, and accurate transcription of the
aforementioned tape to the best of my ability.

I hereby certify that I am a
disinterested party in the above-mentioned
matter and have no interest in the outcome of
the hearing.

Dated April 2, 2006, at Sacramento,
California.

P. M. LaCHAPELLE
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

EXHIBIT E

## PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
### (REVISED AUGUST 1998)
### PAROLE CONSIDERATION HEARING
### AUGUST 2003 LIFER CALENDAR

### CORRECTIONAL TRAINING FACILITY, SOLEDAD
### MAY 12, 2003

This is a psychological evaluation for the Board of Prison Terms on inmate Paul Kip Cleveland, CDC# C-99765.

Inmate Paul Cleveland is a 45-year-old, divorced, Caucasian male who is serving a 27-year to life sentence from Los Angeles County for the offense of PC 187, First Degree Murder, which occurred on 05/23/83. His date of birth is 05/14/59. His MEPD is 02/20/01.

When inmate Cleveland appeared before the Board of Prison Terms on 08/01/02, he was given a three-year denial at Mule Creek State Prison (MCSP). The parole panel requested a new psychological evaluation prepared for his next parole consideration hearing. Since I had written his last psychological evaluation, and since I am currently at the institution where inmate Cleveland is housed, he requested that I address the issues raised by the BPT panel for his forthcoming hearing, scheduled for August 2005. This report is based upon a review of the Central file and medical file, and a one-hour interview with inmate Cleveland.

In reviewing the previous psychological evaluation by this evaluator, dated 12/06/99, the comments made at that time are still quite current and valid. There are no significant changes in the mental status or diagnostic impression sections. The previous BPT panel was concerned because they believed that inmate Cleveland had deceived the evaluator during his psychological evaluation by convincing him falsely that he had no problems with heroin, when in fact he was a heroin addict at the time of the commitment offense. In other words, the BPT panel believed that inmate Cleveland had a serious addiction problem to heroin at the time of the commitment offense.

Inmate Cleveland indicated the same statements to me at this time that he did in 1999. He stated he only injected heroin on three occasions. On his third use of heroin, he committed the commitment offense. He lied to the probation officer. When faced the possibility of the death penalty sentence, he told the probation officer that he had been injecting heroin for the past six months, and was addicted. He stated this because he did not want to face the death penalty, and he wanted to appear as a narcotic addict. However, he was not addicted to heroin at the time of the commitment offense, and in fact he stated that heroin is a very distasteful drug that makes him very sick. Inmate Cleveland stated that he has a severe allergy to opiates. In looking through his medical file, I see that physicians have documented the fact that he is allergic to opiates, which make him very ill. Therefore, this fact would certainly argue against the idea that he was addicted to heroin. Any use of heroin would make him physically ill.

| CLEVELAND | C-99765 | CTF-CENTRAL | 05/12/03 | gmj |

CLEVELAND, PAUL KIP
CDC NUMBER: C-99765
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

## CLINICAL ASSESSMENT

### XII.   CURRENT MENTAL STATUS/TREATMENT NEEDS:

The mental status examination continues to be within normal limits. Inmate Cleveland's thinking was rational and logical. His speech was normal, fluent and goal-oriented. There is still no evidence of a thought disorder. There is no evidence of emotional problems. His affect was appropriate. He was cooperative and able to communicate very well during the interview.

Inmate Cleveland's pattern of nonviolent disciplinaries was explained in the last evaluation. In order to keep his points high so he would not be forced to live in the Mule Creek State Prison (MCSP) dormitory. He accumulated harmless disciplinaries voluntarily. Now that he is housed at CTF, this is no longer a problem, and he has remained disciplinary-free.

There is no indication over the 20 years of his incarceration that he has demonstrated a problem with drug or alcohol abuse of any kind. Even though he does not seem to need to attend Narcotics Anonymous, he is attending it now. He stated that he has no interest in drug or alcohol use, and he is not at all tempted by it, even though it may be available to him. Due to the number of years that he has remained free from drug or alcohol use, I do not believe that he qualifies to be given a diagnosis which would indicate a disorder in that area at this time.

### CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:     No Contributory Clinical Disorder.
AXIS II:    No Contributory Personality Disorder.
AXIS III:   No Contributory Physical Disorder.
AXIS IV:    Life term incarceration.
AXIS V:     Current GAF = 90.

### XIII.   REVIEW OF LIFE CRIME:

The life crime was described in the previous evaluation by this evaluator dated 12/06/99. There are no significant changes, and that explanation continues to be current and valid.

### XIV.   ASSESSMENT OF DANGEROUSNESS:

This writer has been accumulating research done on recidivism rates of life-term inmates across the United States. Research gathered on life term inmates show that they essentially never reoffend with a new murder. They may violate technical terms of parole by minor parole violations, such as not reporting, not working, etc. They rarely reoffend with criminal behavior. Based upon these

CLEVELAND        C-99765        CTF-CENTRAL        05/12/03        gmj

CLEVELAND, PAUL
CDC NUMBER: C-99765
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

factors, as well as factors outlined in my previous evaluation, the following
conclusions are drawn:

A.  Inmate Cleveland's violence potential within the controlled setting of the
institution is definitely below average in comparison to other inmates.

B.  If released to the community, inmate Cleveland's assessment of
dangerousness is also seen as definitely below average in comparison to other
inmates.  In my previous evaluation, I stated that his potential for dangerous
behavior or criminal behavior was no greater than the average individual
living in society.  That statement is still valid.

C.  At this point in his life, there are no significant risk factors which could be a
precursor to violence for this inmate.

## XV.   CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

Inmate Cleveland has accumulated a high level of skill in computer programming,
computer operation, and computer problem-solving.  As a result, he is quite
employable at this point in his life.  There is no evidence of any mental or
emotional problems that would interfere with his being granted a parole date.
There is no need for further psychotherapy or counseling.

*Melvin Macomber, PhD*

**MELVIN MACOMBER, Ph.D.**
Licensed Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

*B. Zika, Ph.D.*

**B. ZIKA, Ph.D.**
Senior Supervising Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

MM/gmj

D:  05/12/03
T:  05/15/03

CLEVELAND        C-99765        CTF-CENTRAL        05/12/03        gmj

# EXHIBIT F

# MULE CREEK STATE PRISON
### Ione, California

## BOARD OF PRISON TERMS
## LIFE-TERM MENTAL HEALTH EVALUATION
### Revised 1998
### FOR THE CALENDAR YEAR OF 2000

## PSYCHOSOCIAL ASSESSMENT

### IDENTIFYING INFORMATION
This appears to be the first psychological evaluation for the Board of Prison Terms concerning Paul Cleveland, a 41-year-old first-term, Caucasian, divorced male that is serving a 27-years-to-life sentence from Los Angeles County for the offense of P.C. 187/Murder, First-Degree, which occurred on 05/23/83. His date of birth is 05/14/59. His MEPD is 02/20/2001.

### SOURCES OF INFORMATION
The following report is based upon review of the inmate's Central File, Unit Health Record, and a single semi-structured 2-hour clinical assessment interview conducted on 12/06/99.

### DEVELOPMENTAL HISTORY
Mr. Cleveland stated that his birth was normal. There were no prenatal or perinatal concerns or complications. His health as a child was good. There were no abnormalities and developmental milestones. He denied a history of cruelty to animals, enuresis, or arson. When questioned about a history of childhood abuse, he denied he had ever been abused either physically, emotionally, or sexually.

### EDUCATION
He stated he dropped out of high school in the eleventh grade while attending high school in Washington. He stated he was bored with school at the time and did not understand the importance of education at that time in his life. He was never suspended or expelled. The most difficulty he had in school was a few fist fights but these were rare. After stopping his education, he enrolled in the military. He completed his GED in the military. His PABE scores dated October 8, 1999, show Reading 12.9, Math 10.5, Language 12.9 with an overall Grade Placement Level of 12.9.

He stated he is very interested in computer programming and maintenance, and he would like to take further courses in this field.

### FAMILY HISTORY
He was born in Oakland and was raised primarily in the Washington Area. He was raised in a stable and intact family environment. His father passed away 12 years ago at the age of 67. His

father was a regional sales representative for a paper company. His mother is still living in Washington and she is 77 years of age. She is still employed selling fabrics in a department store. He stated there was no family history of criminal behavior, substance abuse, or mental health problems.

He is the fifth of six children. A younger sister was killed in an automobile accident at the age of 37. His oldest sister is Martha, age 53, who works in the post office in Washington. Mark, age 50, is a self-employed truck driver in Washington. Chris, age 47, lives in Washington and is a playwright plus works with the disabled. Vicki, age 44, is physically disabled and also lives in Washington. He stated Vicki has a physically debilitating disorder similar to muscular dystrophy, and she is confined to a wheelchair but also uses crutches. He stated family members do visit whenever they can and see him on an at least annual basis. He gets more frequent visits from Martha who travels to California to visit her daughter. He stated he was raised by his own parents until he was 17 when he left home. He described his home life as normal and happy. He was raised in upper middle class neighborhoods. Both parents worked, and the family would take summer vacation trips. He stated he has always been closer to his mother as his father was somewhat distant. His father always showed love and was a good provider. He described his mother as a very loving person. He ran away when he was 15 on one occasion with a friend, and at that time, he was arrested on two occasions for stealing gas. When asked about a history of stealing, he stated at the age of eight, he stole a couple of dollars left out on the porch by a neighbor to buy bread. He stated he was punished by being grounded and receiving extra chores. His parents never separated. He described his relationship with his family as close with frequent phone calls and letters and occasional visits.

### PSYCHOSEXUAL DEVELOPMENT & SEXUAL ORIENTATION

He stated his sexual orientation is heterosexual. There is no history of psychosexual problems. His first sexual contact with a girlfriend was at the age of 15. He believed he may have had about ten different sexual partners in his lifetime.

### MARITAL HISTORY

He married Denise Henkis in March 1977. This marriage ended in divorce, and they separated in February 1980. There were no children from this relationship. He has no contact with Denise.

### MILITARY HISTORY

He joined the US Army Reserves in May 1975 until February 1977 when he joined the regular Army. He remained in the Army until February 1980 leaving with an Honorable Discharge. He stated he was a radar operator and was stationed in Korea. He did not become involved in combat.

### EMPLOYMENT/INCOME HISTORY

Before his incarceration, he was employed as an automobile mechanic, warehouseman, and metal finisher on a short-term basis. His longest employment in the community was for the Army. In

the institution he has worked for ten years for PIA Industries. He currently is enrolled in vocational computer programming at Mule Creek State Prison. He has completed two years in this program and has about one more year left to complete it. He stated he is functioning as a team leader teaching others network managing and setting up and maintaining network operations. He stated he also has experience in computer repair and maintenance. He stated he is definitely interested in working with computers when he is released to the community.

## *SUBSTANCE ABUSE HISTORY*

When questioned about substance abuse, he stated he has had occasional use of alcohol plus experimental use of other drugs he tried only a couple of times. He began using marijuana at the age of 13 and used it regularly over the years. Regarding use of heroin, he stated he only injected heroin on three occasions. On his third use of heroin, he committed the commitment offense. He stated he told the probation officer he had been injecting heroin for the past six months, was addicted, and was spending $75/daily. He stated he told this because he did not want to face the death penalty and wanted to appear as a narcotic addict. He denied he ever was addicted to heroin at the time and stated he finds heroin to be a very distasteful drug. He has not become involved with Narcotics Anonymous or Alcoholics Anonymous at this point.

## *PSYCHIATRIC & MEDICAL HISTORY*

When questioned about his current health, he stated he has pain in his shoulder that he believes is due to lifting weights in the institution. According to his medical record, this condition is under diagnostic investigation. He also suffers from a herniated disc in his neck that sometimes results with severe headaches. He has never been hospitalized nor has he had serious illnesses or injuries. He has never been hospitalized for psychiatric needs, and he has no history of psychiatric treatment. He does not have problems with seizures. He does not have any problems with black outs or memory.

There are three prior psychological evaluations in the file prepared for the BPT. These will be summarized:

11/20/87. He was seen at DVI/Tracy by G. Houghton, Ph.D., Staff Psychologist, who indicated a diagnostic impression of marijuana abuse by history and major traits of Antisocial Personality Disorder. The psychologist noted in discussing the commitment offense the inmate stated he had been described by his family as an "angry young man" and that he was conscious of this anger but did not know where it came from. He expressed feelings of remorse regarding the victim's death in the commitment offense. Mental status was within normal limits, and there was no evidence of current psychological problems. It was recommended the inmate deal with his drug dependence habit, and he was seen as a bright individual who had the resources to do this as well as develop some insight into his anger and involvement in the commitment offense.

01/16/91. He was seen at DVI by Jean Krepps, Ph.D., Psychologist, who indicated a diagnostic impression of Marijuana Dependence, Polydrug Use, and Adult Antisocial Behavior. Mental

CLEVELAND, Paul                          C-99765                          12/06/99

status was seen as within normal limits. Intellectually he was functioning in the bright range. Violence potential was seen as decreased with abstinence from drugs.

09/26/94. He was seen at DVI by Richard Obrochta, Ph.D., Psychologist, who indicated the diagnostic impression of Polysubstance Abuse by History, No Personality Disorder, however, some avoidant, dependent, passive-aggressive traits, and a GAF of 90. He was described as being basically a loner with no close ties. Violence potential was seen as average in comparison to other inmates, particularly with sobriety. The inmate had participated in some psychotherapy groups.

## PLANS IF GRANTED RELEASE

Although the commitment offense occurred in Los Angeles, Mr. Cleveland definitely wants to parole to the State of Washington to be near his family. He has considerable family support in Washington. He plans on continuing to work in the computer field when he is released to the community. His work reports indicate he is employable in the computer field. There is no indication of mental or emotional problems in this case that would require attendance at parole outpatient clinic. The prognosis for successful community living is good in this case.

## CLINICAL ASSESSMENT

### CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Cleveland was interviewed for two hours on this date. Hygiene and grooming were appropriate. He was alert and well-oriented. His thinking was rational and logical. His speech was normal, fluent, and goal-oriented. There was no evidence of a thought disorder. Intellectually he was quite bright and functioning in the above-average range. Affect was appropriate. His mood was friendly, outgoing, and cheerful. He was very cooperative and involved in the interview and appeared to be very open and self-revealing. There was no evidence of defensiveness. At no time was he agitated or irritated. Mental status appeared to be entirely within normal limits. There was no indication of mental or emotional problems in this case.

In order to determine the current diagnostic classification in this case, it is noted that the inmate does have a history of use of illegal substances, particularly marijuana, which he appeared to be quite dependent on and which resulted in his life being without goals, direction, or meaning after he left the military. There is no indication he was addicted to heroin. However, he admitted he has used heroin on three occasions and was under the influence of a drug at the time of the commitment offense. This use would qualify him for the diagnosis of polysubstance abuse by history. There is no evidence of any other Axis I mental problem. He does not appear to be a sophisticated criminal. His criminal behavior appeared to be clumsy, unplanned, and unsophisticated, hence he does not qualify for the diagnosis of antisocial behavior. Regarding the question of whether there is a Personality Disorder in this case, it has been noted in the past that he has Antisocial Personality Traits. In reviewing the record, it is noted he was arrested two

times as a runaway for stealing gas at the age of 15. There are no other juvenile arrests. As a result, he does not qualify for the label of conduct disorder because there is no indication of repetitive, persistent, or aggressive problems as a juvenile. He does not have antisocial personality disorder traits for the same reason. There is no criminal history prior to the commitment offense. One might argue that his ongoing pattern of disciplinary rule violations (CDC115s) demonstrates that the inmate does have ongoing problems with noncompliance with institutional rules and regulations, poor impulse control, and an ongoing addiction to cigarettes. However, in reviewing this disciplinary pattern, I noted on 01/26/97, the inmate stated he deliberately obtained the disciplinary write up in order to build up his points. In looking at the pattern of disciplinaries, it is clear as soon as the inmate gets close to being considered for Level 2, he obtains another disciplinary of a nonviolent nature, and as a result, his points rise. In the interview, he volunteered he is deliberately obtaining write-ups of a nonviolent nature by smoking in the housing unit in front of officers in order to keep his points hovering above a* Level 2 level of 30 points. This is because he does not want to transfer to the Level 2 Housing Area at Mule Creek State Prison which is in the gymnasium which has been converted into a large, crowded dormitory. Individuals serving life sentences who have spent a lot of time in custody are very uncomfortable in this dormitory environment due to the lack of privacy, close proximity to other inmates from all directions, high noise level, and inability to sleep with the lights on all night. Mr. Cleveland stated it is not easy to obtain write-ups and hence points in the institution, and he has to go out of his way to smoke in front of an officer in order to get written up. One may question the wisdom in this tactic, however. It is evident Mr. Cleveland's disciplinary problems are not related to his poor impulse control but are related to a deliberate and planned maneuver to retain his cell housing status. He also indicated he does not believe he will get a date, and therefore, this strategy is not inappropriate for him.

In summation, there is not enough evidence to support the diagnosis of Antisocial Personality Disorder or Antisocial Personality Traits in this case. There is also not enough evidence to support the presence of any other personality disorder traits at this time. Mr. Cleveland does appear to have matured considerably over the years that he has been in custody. He is now highly work-oriented, achievement oriented, and appears to have resolved any problems he had with being an angry young man.

*

### DIAGNOSTIC IMPRESSIONS

| | |
|---|---|
| Axis  I | 304.30 Cannabis Dependence by History |
| | 304.80 Polysubstance Abuse by History |
| Axis  II | No Mental Disorder |
| Axis  III | No Disorder |
| Axis  IV | Incarceration |
| Axis  V | Global Assessment of Functioning (GAF) = 90 |

## REVIEW OF LIFE CRIME

In discussing the details of the commitment offense, Mr. Cleveland stated that he had been carrying his pistol because he had hoped to sell it later that day. He was behind on his rent and bills and was not able to pay for them. On an impulse, he decided to rob the market. He showed the lady behind the counter his pistol and demanded money. She did not understand him and just stood there. He went behind the counter, opened the cash drawer, and started taking money. The lady ran to the rear of the store, and as he was about to leave, the victim, a man he had never seen before, came towards him holding a 2 x 4 like a baseball bat. Mr. Cleveland stated he pointed the gun at him and told him to stop. The man stopped, and so he lowered the pistol, and at that point, the man began to approach him in a threatening manner again. He raised the pistol and fired it and had no idea he had shot the man as he ran out the door. He stated this crime was unplanned. He stated at that time in his life, he had a very poor attitude, he was unable to find work, and he was very upset. He knew robbery was wrong, but he thought since others get away with robbery, maybe he could get away with it. He stated he never intended to kill anyone. He went on to state he feels terrible about what happened. At first he could not believe it did happen. He stated the death of the man is something he deals with on a daily basis. Also, the hurt caused to the victim's family is never ending. He stated he does not know how many family members the man had, but he knows about his own nieces and nephews, and he knows the impact the man's death would have upon them. He stated the reason the man died was because of Mr. Cleveland's own laziness, childishness, and irresponsibility. He accepted full responsibility for the man's death and knows he will suffer with the consequences of his actions for the rest of his life. His statements of remorse appear to be quite genuine and sincere.

## ASSESSMENT OF DANGEROUSNESS

Research has been conducted to determine factors associated with potential for violence. Several factors associated with probability of re-offense as well as probability of low potential for re-offense have been discovered. In considering these factors, in this case, Mr. Cleveland does have a history of use of illegal street drugs, and in fact, on the day of the commitment offense, he was under the influence of heroin. He also has a juvenile record at the age of 15 when he stole a pass. Also, the offense occurred when he was 26 years of age which also indicates a higher level of probability of re-offense. On the other hand, he has numerous factors that would indicate a low association with re-offense in the future by research. He was raised in a stable home and raised by both parents who remained in an intact marriage throughout their lifetime. He also has a history of marriage himself. He had a good school adjustment. There is no evidence of the presence of a personality disorder that would contribute to violent behavior in the future. There is no evidence that he is psychopathic in his thinking or values. He has generally made a good institutional adjustment without evidence of violent behavior in recent years, and he has no criminal behavior as an adult prior to the commitment offense. The commitment offense appears to be quite out of character. The assessment of dangerousness within the controlled setting of the institution is seen as below average in comparison to other inmates. The assessment of dangerousness, if released to the community, is also below average in comparison to other

inmates. The assessment of dangerousness is not greater in this case than in the average individual in society. Significant risk factors in this case would be any use of drugs or alcohol.

### CLINICAL OBSERVATIONS/COMMENTS/RECOMMENDATIONS

He does not have any mental or emotional problems. He has no need for further psychotherapy or treatment. Participation in either Narcotics Anonymous, Alcoholics Anonymous, or some other substance abuse program such as professionally-lead courses in substance abuse is recommended in this case. There are no other psychological recommendations.

MELVIN MACOMBER, Ph.D.
Licensed Psychologist

MM:cmb

Orig:  C-File
cc:  Med. File
     C & PR
     BPT
     CC I
     Inmate

# EXHIBIT G

☒ DOCUMENTATION HEARING

☐ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

**INSTRUCTIONS**

TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.

TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 12-20-90 TO 01-28-91 | | | Remained at DVI in the general population with MED A custody, assigned to PIA Upholstery shop where he received average grades. He remained disciplinary free during this time frame. No laudatory or adverse chrono's received. |
| 01-29-91 TO 01-28-92 | | | Remained at DVI in the general population with MED A custody, assigned to PIA Upholstery, where he received above average to exceptional grades. He was disciplinary free this time frame. He received no laudatory or adverse chrono's. On 02-26-91 he appeared before the BPT for a Documentation Hearing. The panel recommended AA or NA program. |
| 01-29-92 TO 01-28-93 | | | Remained at DVI in the general population with MED A custody assigned to the PIA Upholstery shop where he received above average to exceptional work reports. He was disciplinary free. No laudatory or adverse chrono's issued during this time frame. |
| 01-29-93 TO 01-28-94 | | | Remained at DVI in the general population with MED A custody, assigned to PIA Upholstery. On 04-06-93 he was assigned to PIA warehouse. Grades ranged from average to above average. One (1) laudatory chrono received 02-01-93 from his supervisor. On 09-17-93 he received a CDC 128-A for not being in compliance with cell standards. |
| 01-29-94 TO 08-24-94 (PRESENT) | | | Remained at DVI in the general population with MED A custody assigned to PIA warehouse. Grades range from average to exceptional. Two (2) laudatory chrono's dated 02-18-94 and 06-09-94 based on his job performance. On 07-05-94 he received a CDC 115 for participating in a work strike. |

| CORRECTIONAL COUNSELOR SIGNATURE | | | | | DATE 9 15 94 |
|---|---|---|---|---|---|
| NAME CLEVELAND | CDC NUMBER C-99765 | INSTITUTION DVI | CALENDAR 10/94 | | HEARING DATE |

COPY SENT TO INMATE 9-19-94

IPT 1004 (REV 7/88)

PAGE 1 of 2

STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| | | | assessed 15 days Loss of Privileges. 8-8-88 he appeared before Unit I Classification Committee for consideration for reduction in custody. His custody was reduced to Medium A and he was continued on present program. 9-13-88 he appeared before Program Unit I Classification Committee for Program Review due to his request for assignment to Prison Industries. His name was placed on top of the Industries Waiting List. 9-19-88 he was assigned to Inside Crew #6 Prison Industries. 9-28-88 he was assigned to Industries Upholstery Shop. During this period of evaluation Cleveland retained Medium A Custody. |
| 01-29-89 to 01-28-90 | | | 4-11-89 Cleveland appeared before Program Unit I Classification Committee for his Annual Program Review and was continued on present program. 6-19-89 he received a CDC 128-A from L. Negron, Correctional Officer for late arrival to industry assignment. 10-22-89 he received CDC 115 #962-1, for being out of bounds. He was found guilty and assessed 30 days Loss Of Credit and 90 days Loss of Privileges. 11-15-89 he appeared before Program Unit I Classification Committee for confirmation of Loss of Credit per CDC 115 dated 10-22-89 and he was continued on present program. During this period of evaluation, Cleveland retained Medium A Custody and continued to receive good work reports. |

ORDER:

☐ BPT date advanced by _____ months.      ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.      ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

_____

☐ Schedule for Progress Hearing on appropriate Institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| CLEVELAND | C-99765 | DVI | FEBRUARY 1991 | |

1004 (REV. 7/86)          PAGE 2 of 3          PERMANENT ADDENDA